**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| **MAKIA SMITH,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CASE NO.:   1:13-cv-1352-MJG** |
| **BALTIMORE CITY POLICE** | * | |
| **DEPARTMENT,** *et al.,* | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### PLAINTIFF'S OPPOSITION TO DEFENDANTS PILKERTON, ULMER AND CAMPBELL'S PARTIAL MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Makia Smith, by and through her undersigned counsel, in accordance with the Court's Orders of September 29, 2014 (ECF No. 59) and October 14, 2014 (ECF No. 67), hereby opposes the motions for partial summary judgment ("Motion") filed by Officers Pilkerton, Ulmer and Campbell (collectively, the "Officer Defendants")[1]. (ECF No. 64.)  Plaintiff incorporates by reference her previous filings bearing upon the arguments set forth in the Officer Defendants' motions.  (ECF Nos. 56, 58, 61-3.)

### STATEMENT OF FACTS

On March 8, 2012, at approximately 3:50 p.m., Baltimore City Police Officer Talmadge Jackson requested assistance at the 2800 block of Harford Road to assist him with crowd control as he arrested a young boy.  (Exhibit A, Deposition of Nathan Church ("Church") 171:21-172:10.)  In response to this call, the Officer Defendants, among other officers, drove to the location to assist Officer Jackson.  (Exhibit B, Deposition of Nathan Ulmer ("Ulmer") 38:12-20;

---

[1] While the Motion also raises arguments on behalf of Officer Nathan Church, the Court ruled on October 14, 2014, that Plaintiff need not respond to these arguments and that the Motion is denied as to Officer Church.  (ECF No. 67.)

40:3-5; Exhibit C, Deposition of Kenneth Campbell ("Campbell") 10:10-11:14; Exhibit D,

Deposition of William Pilkerton, Jr. ("Pilkerton") 10:5-9.)

Between 3:30 p.m. and 4:00 p.m. that same day, Plaintiff Makia Smith was driving along

Harford Road on her way home with her two-year old daughter.  (Exhibit E, Deposition of Makia

Smith ("Smith") 21:8-22:4; 9:6-12; 31:1-10.)  Traffic was slow because several school age

children were running in and near the road and around Clifton Park.  (Smith 22:6-23:15.)  As

Plaintiff approached the 2800 block of Harford Road, stop and go traffic slowed to a complete

stop.  (Smith 49:20-21.)  At that point, Plaintiff looked to her right and saw police officers

arresting a young boy in Clifton Park.  (Smith 23:17-19.)  Plaintiff saw an officer with his knee

to the boy's head, which "alarmed" her.  (Smith 23:19-24:2.)  So at that point Plaintiff turned off

her car, which, due to traffic, was unable to move forward, got out and began to film the arrest

with her cell phone camera.  (Smith 23:17-24:4.)

Almost immediately, Officer Nathan Church, who had responded to Officer Jackson's

call for assistance, saw Plaintiff filming and shouted for her to get back in her car.  (Smith 36:13-

16.)  Plaintiff responded by saying something to the effect of, "I'm not going to let you all hurt

that little boy."  (Smith 36:18-20; Ulmer 61:10-16.)  At that point, Officer Church ran toward

Plaintiff's car "like the Incredible Hulk."  (Smith 37:9-13.)  Plaintiff hurried to get back inside

the car because she was scared.  (Smith 37:15-17.)  When Officer Church arrived at the car, he

reached inside and grabbed Plaintiff's cell phone out of her hand, threw it to the ground, smashed

it with his foot, kicked it to the curb, and said "You want to film, I should knock your teeth out."

(Smith 54:14-56:12.)  He then pulled Plaintiff out of the car by her hair.  (Smith 56:3-5.)

Meanwhile, at approximately the same time Officer Church saw Plaintiff filming the

arrest, so did Officers Pilkerton, Campbell and Ulmer.  (Pilkerton 36:22-37:1; 18:2; Ulmer

75:12-14; 78:14-16; 82:14-83:1; Campbell 20:5-15.)  These three officers were standing on the edge of Clifton Park, on the same side of Harford Road as Officer Church.  After seeing Plaintiff film the arrest, each of Officers Pilkerton, Campbell and Ulmer rushed to her car.  (Pilkerton 18:16-19:1; 20:7-21:8; Ulmer 93:19-94:6; Campbell 28:20-22.)  Eyewitness Tricezette Kennedy believes the Officer Defendants arrested Plaintiff because she was filming police officers.  (Exhibit F, Deposition of Tricezette Kennedy ("Kennedy") 22:19-23:11.)  Officer Pilkerton was the first to arrive and he helped Officer Church pull Plaintiff out of the car.  (Pilkerton 18:16-19:1; 20:7-21:8.)  According to his own testimony, Officer Pilkerton proceeded to struggle with Plaintiff for approximately two minutes before she was handcuffed.  (Pilkerton 18:16-19:1; 20:7-21:8; 27:20-29:10.)

Officer Campbell arrived at Plaintiff's car a few seconds later and assisted in spinning her around to face the car, pulling her left arm up so hard Plaintiff thought it was going to break, and putting handcuffs on her left hand.  (Campbell 28:20-22; Exhibit G, Campbell's Response to Interrogatory No. 5; Smith 60:13-61:4.)  Similarly, Officer Ulmer, after seeing Plaintiff filming, arrived at her car soon after the other officers.  When he arrived, the other officers were already "dealing" with Plaintiff.  (Ulmer 94:13-17.)  Officer Ulmer assisted with the arrest, but cannot recall exactly what he did.  (Ulmer 96:17-97:6.)

Eyewitness Renee Coleman, who worked at Hair Pizzazz on Harford Road across the street from where the young boy and Plaintiff were being arrested (Exhibit H, Deposition of Renee Coleman ("Coleman") 7:17-8:1) and who also serves as a correctional officer for the State of Maryland (Coleman 5:14-6:8), testified that after Plaintiff was pulled from her car, she saw three officers "rough handling her on the ground."  (Coleman 23:6-8) "Rough handling her, yes, to the ground.  They got her up. And they still at the car.  They went like to the back part of the

car, and that's when they put the handcuffs on her." (Coleman 23:10-13.) "They slammed her

on the car. Handcuffed her from the back." (Coleman 37:2-3.)

Plaintiff herself testified that once she was pulled from the car, "I just feel about three

officers just—I just thought like three people just throwing me around, just throwing me around.

So I can feel it coming from—I could feel—you know, I could feel it coming from different

people, but I couldn't see anybody else." (Smith 58:1-8.) She also remembers being "slammed"

on the car. (Smith 62:15-20.)

While Plaintiff was being arrested, her two-year old daughter was sitting in her car seat in

the back of the car, screaming. (Smith 32:2-5.) Once Plaintiff was in handcuffs, a girl from

across the street called to Plaintiff to see if she needed help with the child. Plaintiff asked

Officer Church whether she could call her mother to come pick up the child, but he said no—that

Child Protective Services would be taking the child. (Smith 32:5-15.) The Officer Defendants

were standing near Officer Church and Plaintiff while this conversation was taking place.

(Ulmer 113:18-114:10; Pilkerton 32:18-33:7; Church 263:11-15.)

Officer Pilkerton testified that he learned there was a child in the backseat when he heard

Plaintiff tell all of the officers, "My baby is back there." (Pilkerton 29:15-21.) Officer Ulmer

knew there was a child in the backseat but does not recall any officer trying to pacify her or

taking the child out of the car. (Ulmer 120:14-121:3.) Despite Officer Pilkerton's testimony,

Officer Campbell testified that he did not even know there was a child in the backseat of

Plaintiff's car until he heard about the child during Officer Church's deposition in this matter.

(Campbell 34:13-35:2.)

Ms. Tricezette Kennedy, testified that the Officer Defendants were upset and screaming,

and that Plaintiff was screaming for someone to call her mother to come get her daughter.

4

(Kennedy 18:5-12.)  Ms. Kennedy testified that Plaintiff asked "could someone call her mom, and they said no."  (Kennedy 20:14-15.)  Understandably distraught, Plaintiff yelled across the street to the young girl to come get her daughter, it being apparent that neither Officer Church nor the Officer Defendants had any intention of helping her secure the safety of her daughter.  As Plaintiff was yelling her mother's cell phone number to the young girl, the Officer Defendants dragged Plaintiff to the police wagon.  (Smith 32:2-34:10.)

Plaintiff suffered injuries during the arrest.  She had bruises and complained of a severe headache when she reached Central Booking.  The nurse at Central Booking looked at Plaintiff's neck and said that she could not book Plaintiff until she had been taken to the hospital.  (Smith 69:2-8.)  At the hospital, Plaintiff was prescribed with a week's worth of pain medication.  (Smith 76:2-78:3.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  In undertaking this inquiry, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris,* 550 U.S. 372, 378 (2007).

The Officer Defendants rely upon a qualified immunity defense to support dismissal of Plaintiff's § 1983 claims.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  In determining whether an officer must be afforded qualified immunity, courts engage in a two-step analysis. *Wilson v. Layne,* 526 U.S. 603, 609 (1999).  First, a court determines whether a constitutional right has been violated.  This first prong of the qualified immunity analysis must proceed by determining whether the facts alleged, taken in the light most favorable to the party asserting the injury, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *see also, Veney v. Ojeda,* 321 F. Supp. 2d 733, 743 (E.D. Va. 2004) (viewing the evidence in the light most favorable to the plaintiff, triable issues of fact existed with respect to whether Officer Jones used excessive force during a traffic stop).

Second, "assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier v. Katz,* 533 U.S. 194 (2001)).  "At the summary judgment stage, once [the court] view[s] the evidence in the light most favorable to the nonmovant party, the question of whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011); *Veney,* 321 F. Supp. 2d at 744 ("taking the evidence in the light most favorable to the plaintiff, it appears that a reasonable officer in Officer Jones' shoes could not have believed that his exertion of force was necessary or reasonable").  District

Courts may consider these two prongs in whatever order seems most efficient.  *Pearson v. Callahan,* 555 U.S. 223 (2009).

## ARGUMENT

**I.   THE OFFICER DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO PLAINTIFF'S FIRST AMENDMENT CLAIMS (COUNTS I AND II).**

Counts I (Section 1983, First Amendment) and II (Maryland Declaration of Rights, Article 40) assert that the Officer Defendants retaliated against Plaintiff for filming other police officers arresting a young boy in Clifton Park.  The Officer Defendants contend that these claims fail because their "decision to assist in the arrest was objectively reasonable in light of the circumstances and existing law," relying upon *Carter v. Jess,* 179 F. Supp. 2d 534, 544 (D. Md. 2001).  This is not the correct standard to apply.  *Carter* involved the Fourth Amendment right to be free from arrest without probable cause, not a First Amendment claim.  Similarly, the Officer Defendants rely upon *Whren v. United States,* 517 U.S. 806, 812-813 (1996), to contend that the subjective intent of these Officers while assisting in the arrest is irrelevant "to the inquiry of whether probable cause for the arrest is present in a given circumstance."  (Motion, p. 3.)  While this may be true with respect to a probable cause analysis, *Whren* also did not involve a First Amendment claim.  As explained below, the subjective intent of the Officer Defendants *is* relevant in a First Amendment analysis.

Summary disposition of Plaintiff's First Amendment claims pursuant to a qualified immunity defense would be inappropriate because evidence exists to support a determination that the Officer Defendants violated Plaintiff's First Amendment rights.  Moreover, an objectively reasonable officer, confronted with the facts as presented by Plaintiff, would have known that Plaintiff's arrest was unconstitutional.

### a. **Plaintiff's First Amendment Rights Were Violated.**

To establish a First Amendment retaliation claim Plaintiff must establish that "(1) she engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 499 (4th Cir. 2005). Because the retaliatory motive of government actors is an element of a First Amendment retaliation claim, such claims "seldom lend themselves to summary disposition." *Swagler v. Sheridan,* 837 F. Supp. 2d 509, 529 (D. Md. 2011), quoting *Ctr. For Bio-Ethical Reform v. City of Springboro,* 477 F.3d 807, 823 (6th Cir. 2007).

### i. **Plaintiff Engaged in Protected First Amendment Activity.**

Plaintiff engaged in protected First Amendment activity when she used to her cell phone to record the police activity in Clifton Park. Plaintiff was filming a matter of public interest— police officers arresting a young boy. The Baltimore City Police Department itself, since Plaintiff's arrest, has recognized that

> members of the general public have: A First Amendment right to video record, photograph, and/or audio record BPD members, while BPD Members are conducting official business or while acting in an official capacity in any public space, unless such recordings interfere with police activity. … In furtherance of this policy, members may not prevent or prohibit any person's ability to peaceably observe or record police activity that occurs in public, or where the person recording otherwise has the right to be."

Exhibit I, General Order J-16, "Video Recording of Police Activity," April 23, 2014. Moreover, several courts have acknowledged that a citizen's act of recording police activity is protected by the First Amendment. *Sharp v. Baltimore City Police Department,* Civil Action No. 1:11-cv-02888 (CCB) (ECF No. 33) (D. Md. Feb. 17, 2012) ("The First Amendment generally protects

the right of citizens to take photographs and videos in public places.  The parties agree that this right extends to photos and videos of police officers discharging their official duties, but the exercise of the right may be limited by reasonable time, place, and manner restrictions.") (Exhibit J);  *Garcia v. Mongomery County, Md.,* 2013 WL 4539394, *3; Civil Action No. JFM-12-3592 (D. Md. Aug. 23, 2013) (First Amendment claim stated where police officers interfered with plaintiff's ability to photograph an arrest taking place in public); *Smith v. City of Cumming,* 212 F.3d 1332 (11th Cir. 2000) (plaintiffs had a First Amendment right to photograph or videotape police conduct); *Williamson v. Mills,* 65 F.3d 155 (11th Cir. 1995) (reversing district court's grant of qualified immunity to a law enforcement officer who seized the film of and arrested a participant in a demonstration for photographing undercover officers); *Glik v. Cunniffe,* 655 F.3d 78, 83 (1st Cir. 2011) (the First Amendment protects the right of a private citizen to film police activity, as the "gathering of information about government officials in a form that can readily be disseminated to others serves as a cardinal First Amendment interest in the protecting the free discussion of governmental affairs"); *Connell v. Town of Hudson,* 733 F. Supp. 465, 471-71 (D.N.H. 1990) (denying qualified immunity from First Amendment claim to police chief who prevented freelance photographer from taking pictures of car accident); *Robinson v. Fetterman,* 378 F. Supp. 2d 534 (E.D. Pa. 2005) (holding that arrest of individual for filming police activities violated First Amendment).

The evidence establishes that Plaintiff got out of her car to film the arrest of a young boy that was taking place in a public park.  There is no question that the police activity occurred in a public forum and that it was a matter of public interest that is rightfully protected by the First Amendment.

**ii. Officers Ulmer, Pilkerton and Campbell Took Action that Adversely Affected Plaintiff's Rights.**

Whether or not Plaintiff's protected speech was actually curtailed by Officers Campbell, Pilkerton and Ulmer is not dispositive. *Constantine,* 411 F.3d at 500. Rather, the court's inquiry must evaluate whether the Defendants' actions "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (internal quotation marks omitted). This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship. *See Balt. Sun Co. v. Ehrlich,* 437 F.3d 410, 416 (4th Cir. 2006). Importantly, because "conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, ... a plaintiff need not actually be deprived of [her] First Amendment rights in order to establish First Amendment retaliation." *Constantine,* 411 F.3d at 500.

Officers Ulmer, Pilkerton and Campbell saw Plaintiff filming police activity. (Pilkerton 36:22-37:1; 18:2; Ulmer 75:12-14; 78:14-16; 82:14-83:1; Campbell 20:5-15.) When Officer Church asked Plaintiff to move her car, notwithstanding that traffic was stopped, she responded, "I'm not going to let you all hurt that little boy" (Smith 36:18-20.) Within seconds of seeing her filming, these officers swarmed Plaintiff's car and assisted in arresting her. Viewing the evidence in the light most favorable to Plaintiff, a jury could determine, as did Tricezette Kennedy, that these officers ran to Plaintiff's car to assist in the arrest because she was filming.

Thus, while Officer Church was the one who actually took Plaintiff's phone and destroyed it, the other officers' conduct had a chilling effect on the exercise of her constitutional rights because, in reaction to her filming, they immediately arrested her. Each of the officers made the decision to go to the car and assist with Plaintiff's arrest, and Officers Pilkerton and Campbell effectuated that arrest using excessive force (as described below). Such conduct would likely deter a person of ordinary firmness from filming police activity in the future.

Accordingly, triable issues of fact exist regarding whether Officer Ulmer's, Pilkerton's and Campbell's conduct violated Plaintiff's First Amendment rights.

### iii. There is a Causal Relation Between Plaintiff's Filming and the Officers' Conduct.

A showing that the defendant was aware of the protected activity can be enough to establish the requisite causation. *Constantine,* 411 F.3d at 510, citing *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998). Close temporal proximity between the protected activity and the defendant's conduct also supports a causal connection. In *Constantine*, approximately four months elapsed between the protected speech and the retaliatory conduct. That span of time was sufficiently close to create a causal connection. 411 F.3d at 510. Similarly, in *Price v. Thompson,* a nine-month lapse created a "very close question" as to causal connection, but nevertheless the Fourth Circuit concluded that the claim should survive a motion to dismiss. 380 F.3d 209, 213 (4th Cir. 2003). However, in *Huang v. Board of Governors of University of North Carolina*, a six-year delay between the protected speech and the retaliatory conduct was too long to evidence a retaliatory motive. 902 F.2d 1134, 1141 (4th Cir. 1990).

Here, viewing the evidence in the light most favorable to Plaintiff, the Officer Defendants knew Plaintiff was filming police activity and reacted immediately. The extremely short period of time between Plaintiff's filming and Defendants' participation in her arrest is sufficient to establish a causal connection between the two. *See Tobey v. Jones,* 706 F.3d 379, 387 (4th Cir. 2013) (denying motion to dismiss First Amendment retaliation claim where plaintiff was arrested immediately after he removed his shirt to reveal the text of the Fourth Amendment written across his chest). The foregoing analysis establishes that taking the evidence in the light most favorable to Plaintiff, the Officer Defendants' conduct violated Plaintiff's First Amendment rights.

**b.   At the Time of the Arrest, It Was Clear To an Objectively Reasonable Officer That His Conduct Violated Plaintiff's First Amendment Rights.**

Turning to the second step of the qualified immunity defense, again viewing the evidence in the light most favorable to Plaintiff, her First Amendment rights were clearly established at the time of the arrest such that it would be clear to an objectively reasonable officer that the Officer Defendants' conduct violated those rights. *Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier v. Katz,* 533 U.S. 194 (2001)).  In addition to the court decisions from various circuits described above establishing a First Amendment right to record police conduct, in November 2011, prior to Plaintiff's arrest, the Baltimore City Police Department adopted General Order J-16, "Video Recording of Police Activity."  (Exhibit K.)  Each of the Officer Defendants was familiar with this policy at the time of Plaintiff's arrest.  (Pilkerton 38:13-18; Ulmer 123:3-6; Campbell 38:21-39:11.)  General Order J-16 provides in part,

> It is the policy of the Baltimore Police Department to ensure the protection and preservation of every person's Constitutional rights. In furtherance of this policy, no member of the Baltimore Police Department may prevent or prohibit any person's ability to observe, photograph, and/or make a video recording (with or without a simultaneous audio recording) of police activity that occurs in the public domain, so long as the person's location, actions, and/or behavior do not create a legitimate, articulable threat to Officer safety, or an unlawful hindrance to successful resolution of the policy activity."

(Exhibit K, p. 1.)  In light of this written policy and the established case law, it was clearly established at the time of Plaintiff's arrest that it would be a violation of the First Amendment to arrest someone because they are filming police activity.  Accordingly, viewing the evidence in the light most favorable to Plaintiff, it was not objectively reasonable for the Officer Defendants

to assist in Plaintiff's arrest because she was filming.  Accordingly, the Officer Defendants are not entitled to a qualified immunity defense with respect to Counts I or II.[2]

## II.     THE OFFICER DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO PLAINTIFF'S FOURTH AMENDMENT CLAIMS FOR UNLAWFUL ARREST (COUNTS III, IX, X).

There are three counts in the Amended Complaint that implicate Plaintiff's Fourth Amendment right to be free from arrest without probable cause:  Counts III (§1983 Claim under the Fourth Amendment), IX (false arrest), and X (false imprisonment).[3]  Although false arrest and false imprisonment are common law claims, they implicate Plaintiff's Fourth Amendment rights, and thus are properly analyzed as if they were Fourth Amendment claims.  *Carter v. Jess,* 179 F. Supp. 2d 534, 540 (D. Md. 2001) (counts for false arrest and false imprisonment are construed as a single § 1983 claim for arrest without probable cause).

The Officer Defendants contend that they are entitled to qualified immunity with respect to these three claims because their "decision to assist in the arrest was objectively reasonable in light of the circumstances and existing law."  (Motion p. 5.)  As discussed above, triable issue of fact exist regarding this assertion.  The evidence supports a conclusion that the Officer Defendants assisted with the arrest because they were retaliating against Plaintiff for filming police activity.

Relying on *Hines v. French,* 157 Md. App. 536, 551 (2004), the Officer Defendants contend that the claims for battery, false arrest and false imprisonment will not stand because such claims only survive where "there is no legal authority or justification for the arresting

---

[2] State constitutional claims under the Maryland Declaration of Rights are analyzed in the same manner as claims brought under the United States Constitution.  *Okwa v. Harper,* 360 Md. 161, 203-204 (2000).  Thus, Maryland courts would look to federal cases interpreting the First Amendment to determine Plaintiff's rights under Article 40 of the Maryland Declaration of Rights.  *Id.* There is no need to conduct a separate analysis of Count II.

[3] While Count III discusses the seizure of the cell phone, liability under Count III is premised upon the unlawful arrest, not upon seizure of the cell phone.  Additionally, the Officer Defendants are correct that allegations of excessive force have been moved from Count III into Counts XII and XIII.

officer's actions," and here Officer Church had probable cause to arrest Plaintiff.  (Motion p. 6.)
In *Hines,* there was no question that probable cause existed for the arrest, as the plaintiff did not
dispute that the officer began to pursue her car in response to information from a 911 dispatcher
that her car had been involved in a hit-and-run accident.  157 Md. App. at 552.  Here, on the
other hand, as explained in the Plaintiff's September 24 and September 25 letters to the Court
(ECF Nos. 56, 58), there are triable issues of fact surrounding whether or not Officer Church had
probable cause to arrest Plaintiff for traffic violations, or whether the arrest was motivated by the
fact that she was filming.  Thus, the underlying premise of the Officer Defendants' argument
does not stand.

Moreover, this defense hinges on an assumption that the assisting officers, coming to the
arrest after it is already in progress, have "no personal knowledge of the arresting officer's basis
for the arrest."  *Fernandes v. Montgomery County, Md.,* 2012 WL 1664086, *3; Civil Action No.
AW-10-cv-752 (D. Md. May 10, 2012); *see also Carter,* 179 F. Supp. 2d at 544, n.16
("Certainly, however, officers with *knowledge* that their fellow officers are engaged in unlawful
activity, including a wrongful arrest, should not assist in it.").  Here, unlike *Carter* where the
police officer assisted with the arrest after the plaintiff was already face down on the ground, the
Officer Defendants saw the entire interaction between Officer Church and Plaintiff.  They saw
Plaintiff filming, they saw Officer Church approach Plaintiff's car, they heard an exchange of
words between Officer Church and Plaintiff, and they were aware or should have been aware of
the traffic conditions.  Taking the evidence in the light most favorable to Plaintiff, the Officer
Defendants violated the Fourth Amendment by assisting with an unlawful arrest.

With respect to the second prong of the qualified immunity defense, "the requirement that
an officer have probable cause to seize and arrest an individual has been clearly established

constitutional law for decades." *Swagler v. Sheridan,* 837 F. Supp. 2d 509, 536 (D. Md. 2011), quoting *McDaniel v. Maryland,* No. RDB-10-189, 2010 WL 3260007, at *8 (D. Md. Aug. 18, 2010).  Viewing the facts in the light most favorable to Plaintiff, it was unreasonable for the Officer Defendants to assist Officer Church with an arrest that lacked probable cause and that they knew, based on the argument set forth in Section I above, was motivated by a desire to retaliate against Plaintiff for filming police activity.

### III.   THE OFFICER DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO PLAINTIFF'S FOURTH AMENDMENT CLAIMS FOR EXCESSIVE FORCE (COUNTS VIII, XII, XIII).

Counts VIII (battery), XII (§ 1983 Fourth Amendment / Excessive Force), and XIII (Excessive Force in Violation of Articles 24 and 26) encompass Plaintiff's claims for excessive force.[4]  The Officer Defendants contend that Plaintiff cannot maintain any such claims against them because they simply placed the handcuffs on her.  (Motion p. 7.)

"[D]istilled to its essence, the question that a court must answer to determine whether an officer's exertion of force violated the Fourth Amendment is whether a reasonable officer in the same circumstances would have concluded that the threat presented justified the force exerted." *Veney v. Ojeda,* 321 F. Supp. 2d 733, 742-43 (E.D. Va. 2004) (denying officer's motion for summary judgment on excessive force claim where passenger was thrown to the ground during traffic stop).  A court assessing the reasonableness of an officer's exertion of force must consider three factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 742 (1989).  The Fourth Circuit has added a fourth factor, the extent of the suspect's injury. *Jones v.*

---

[4] A battery claim against a police officer in the line of duty is analyzed as a § 1983 claim based on the use of excessive force in violation of the Fourth Amendment.  *Carter,* 179 F. Supp. 2d at 540.

*Buchanan,* 325 F. 3d 520, 527 (4th Cir. 2003). It is inappropriate for a court to grant summary judgment for an excessive force claim when there are disputes regarding the degree, or existence, of the alleged use of excessive force. *Howie v. Prince George's County, citing Young v. Prince George's County, Maryland,* 355 F.3d 751 (4th Cir. 2004) (finding summary judgment precluded by existence of genuine issues of material fact as to the degree and reasonableness of force used by officer).

If the facts at issue are disputed, as they are here, the Court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, establish a constitutional violation. *Id.,* citing *Saucier,* 533 U.S. at 201; *see also Meyers v. Baltimore County, Md.,* 713 F.3d 723, 733 (4th Cir. 2013) ("We emphasize that our analysis is based on the plaintiffs' version of the facts as drawn primarily from the depositions of [plaintiff's] family members, including Billy who stated that he was inside the residence and directly observed Officer Mee's conduct. Although a jury ultimately may find that the officers' version of the events is more credible, we are not permitted to make such credibility determinations when considering whether a police officer properly was held immune from suit under the doctrine of qualified immunity.").

Taking the evidence in the light most favorable to Plaintiff, (1) there was no crime at issue (she had simply filmed police officers and was not obstructing traffic, as traffic was already stopped on Harford Road); (2) Plaintiff did not pose an immediate threat to the safety of officers or others; (3) Plaintiff was not attempting to flee, she got into her car because she was afraid of Officer Church who was approaching her car "like the Incredible Hulk"; and (4) Plaintiff sustained injuries—she was taken to the hospital when she arrived at Central Booking, complaining of a severe headache, was prescribed a week's worth of pain medication. (Smith 69:2-8; 75:16-78:3.)

Against this factual backdrop, the force exerted by Officers Campbell and Pilkerton was excessive.[5]   Officer Campbell pulled Plaintiff's left arm to the small of her back (Campbell 28:20-22), then pulled it "all the way up almost like they were going to break it," saying, "Have you had enough yet?"  (Smith 60:13-61:4.)  Officer Pilkerton with Officer Church engaged in a two minute struggle with Plaintiff to pull her out of the car to get her into handcuffs.  (Pilkerton 18:16-19:1; 20:7-21:8; 27:20-29:10; Church 250:22-252:9.)

While the exact acts of Officers Pilkerton and Campbell cannot be discerned from the eyewitness testimony, nor from portions of Plaintiff's testimony, this testimony nonetheless supports Plaintiff's excessive force allegations.  *Howie v. Prince George's County*, 2009 WL 2426018, *1, 3-4; Civil Action No. DKC 2006–3465 (D. Md. Aug. 5, 2009) (triable issue of fact exists as to excessive force claims even though plaintiff could not articulate what conduct each officer engaged in where evidence supported a finding that the officer defendants took part in plaintiff's beating); *see also Versterhalt v. City of New York,* 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (summary judgment on excessive force claim denied even though plaintiff could not identify which officer assaulted her, but did know the group of officers present during his assault).  There is no question that the Officers Pilkerton and Campbell were present on the scene, participated in Plaintiff's arrest, and laid hands upon her.  The fact that Plaintiff cannot identify who slammed her against the trunk of her car or spun her around or who exactly touched her on which parts of her body is not a bar to these claims proceeding to a jury.[6]

---

[5] Plaintiff is no longer pursuing excessive force claims against Officer Ulmer.  Ulmer himself does not know whether he actually touched Plaintiff, and no one else has provided testimony supporting this fact.  Moreover, testimony from Plaintiff and Renee Coleman corroborate the fact that three officers engaged in physical contact with Plaintiff during her arrest.

[6] Plaintiff's understandable lack of clarity regarding exactly what each Officer Defendant did is exacerbated by the fact that neither Officer Church nor his supervisor, Sergeant Daraine Harris, completed a required Use of Force Report.  That report is designed to document exactly what each officer did during an arrest.  (Exhibit L, Deposition of Sergeant Daraine Harris ("Harris") 41:6-20.)  Despite the fact that Officer Church testified that he wrote such a report (Church 244:2-10), and that Sergeant Harris should have written such a report because Plaintiff was sent to

Here, Renee Coleman testified that she saw Officer Church grab Plaintiff from her car, "that's when I seen other officers coming, and they really manhandled this young lady. Manhandled her.  Manhandled her."  (Renee Coleman 14:21-15:5.)  The other eyewitness, Tricezette Kennedy saw "the police officers manhandling a young lady." "They were being rough with her, pulling on her, scuffling with her." (Coleman 15:15-20.)

Ms. Coleman explained that she saw three officers manhandle Ms. Smith.  (Coleman 35:18-20.)  She saw these officers "rough handling her on the ground."  (Coleman 23:6-8.) "Rough handling her, yes, to the ground.  They got her up.  And they was still at the car.  They went like to the back part of the car, and that's when they put the handcuffs on her."  (*Id.* at 23:10-13.)  "They slammed her on the car.  Handcuffed her from the back."  (Coleman 37:2-3.) Ms. Coleman's testimony comports with that of Officer Campbell who testified that "[w]e had three guys holding her, restrained her at that time."  (Campbell 28:11-12.)

Plaintiff herself testified that once she was pulled from the car, "I just feel about three officers just—I just thought like three people just throwing me around, just throwing me around. So I can feel it coming from—I could feel—you know, I could feel it coming from different people, but I couldn't see anybody else.  At that point, I just don't even—I just blacked out." (Smith 58:1-8.)

Once she was out of the car, Ms. Smith "could feel being tossed, like tossed around between different people, like kind of pushed and shoved, and, you know, things like that.  Being roughed, I guess, you know, and then I don't remember anything.  And then I remember being slammed on the car."  (Smith 62:15-20.)

---

the hospital for treatment (Church 265:4-266:4; Harris 39:17-40:8), none of the Defendants, including the Baltimore City Police Department has been able to locate a Use of Force Report related to Plaintiff's arrest. Defendants' failure to maintain such an important record should not allow any one of them now to avoid liability.

Viewing the facts in the light most favorable to Plaintiff, the evidence establishes that Officers Campbell and Pilkerton violated Plaintiff's Fourth Amendment right to be free from excessive force.  Turning to the second prong of the qualified immunity analysis, again taking the evidence in the light most favorable to Plaintiff, a reasonable officer in the shoes of Officer Campbell or Pilkerton "could not have believed that [their] exertion of force was necessary or reasonable."  *Veney,* 321 F. Supp. 2d 733, 744 (E.D. Va. 2004).

In *Veney,* given the plaintiff's version of events, there was at least a genuine issue of fact as to whether it was reasonable for the officer defendant to grab plaintiff and forcefully throw him to the ground.  *Id.* at 744.  Similarly here, in light of the fact that Plaintiff was filming police conduct in a public place while traffic was at a standstill, there is at least a genuine issue of fact as to whether it was reasonable for Officers Pilkerton and Campbell to engage in the conduct described above.  Officers Pilkerton and Campbell are not entitled to qualified immunity with respect to the Fourth Amendment excessive force claims.

## IV.    TRIABLE ISSUES OF FACT EXIST REGARDING PLAINTIFF'S CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT XI).

Under Maryland law, a claim for intentional infliction of emotional distress requires evidence of the following: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe."  *Carter v. Aramark,* 153 Md. App. 210, 245 (2003).  For conduct to be considered "intentional or reckless," a plaintiff "must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow."  *Adams v. Wells Fargo Advisors, LLC,* 2014 WL 2124447, Civil Action No. ELH-

12-2130, *30 (D. Md. May 21, 2014), quoting *Foor v. Juvenile Servs. Admin.,* 78 Md. App. 151, 175 (1989) (emphasis in original).

Here, the claim of intentional infliction of emotional distress focuses on how the Officer Defendants treated Plaintiff and her two-year old daughter during and after the arrest.  Officer Pilkerton testified that he learned there was a child in the car when Plaintiff told all of the officers, "My baby is back there."  He admitted that Plaintiff was yelling for a girl on the corner to come get her child *while* the officers were putting her in the wagon to be transported to Central Booking.  (Pilkerton 29:15-21.)  Knowing how distraught any mother would be about the well-being of her child in this situation, the Officer Defendants did not allow Plaintiff to call the child's grandmother, and did not even give her enough time to figure out a safe place for her daughter to go.  Instead, they dragged her, yelling out her mother's cell phone number, to the police wagon.  (Smith 32:2-34:10.)

Amazingly, Officer Campbell testified that he did not even know there was a child in the car until he sat through Officer Church's deposition.  (Campbell 34:13-35:2.)  Such testimony defies his training, which surely involved looking inside a car during an arrest, and is of questionable credibility in light of testimony provided by Plaintiff, eyewitnesses, and the other Officer Defendants, who clearly knew the child was there.

Officer Pilkerton, for his part, could only guess about what happened to the child.  He testified that "probably an officer was standing by the child" until her grandmother arrived.  (Pilkerton 32:1-4.)  This statement is contested by testimony from Tricezette Kennedy stating that in fact, the child was removed from the car by her and the young girl from across the street.  Ms. Kennedy called the grandmother, told her about the arrest, and told her that the child was now with Ms. Kennedy and the young girl.  (Kennedy 20:18-21:5.)  Officer Ulmer knew the

child was in the car, but does not recall any officer trying to pacify her or taking the child out of the car. (Ulmer 120:14-121:3.)  Ms. Kennedy, who was on the scene, provides corroborating evidence.  She testified that the officers were upset and screaming. (Kennedy 18:5-8.)  She recalls Plaintiff screaming for someone to call her mother to come get her daughter. (*Id.* at 18:9-12.)  She remembers Plaintiff asking "could someone call her mom, and they [the officers] said no." (*Id.* at 20:14-15.)  They took her from her child without any assurance the two-year old would be cared for.  Plaintiff's emotional distress about this incident is understandable to any parent and was manifested by the fact that she was crying and screaming on the scene. (Smith 68:13-19; 33:7-10.)

In sum, the Officer Defendants knew the child was there and did nothing to protect her from harm.  They refused Plaintiff the opportunity to make arrangements for the safe custody of her child, knowing this was causing her great distress.  Plaintiff was left to scream out her mother's cell phone number to a crowd of strangers, in the hopes that someone would help.  No parent should be placed in this situation, especially not by those sworn to protect and serve.[7]  Viewing the facts in the light most favorable to the Plaintiff, a triable issue of fact exists regarding whether the Officer Defendants intentionally inflicted emotional distress.

---

[7] Plaintiff's expert will provide testimony at trial regarding the Officer Defendants' failure to protect Plaintiff's daughter during and after Plaintiff's arrest.

## CONCLUSION

For the foregoing reasons, the Officer Defendants' Motion for Partial Summary Judgment should be denied in its entirety.


Date:   October 29, 2014                              Respectfully submitted,


                                                      ___/s/ James B. Astrachan_____
                                                      James B. Astrachan, Bar No. 03566
                                                      Christopher J. Lyon, Bar No. 27443
                                                      Elizabeth A. Harlan, Bar No. 18285
                                                      ASTRACHAN GUNST THOMAS, P.C.
                                                      217 East Redwood Street, Suite 2100
                                                      Baltimore, Maryland 21202
                                                      Telephone:  410.783.3550
                                                      Facsimile:  410.783.3530
                                                      jastrachan@agtlawyers.com
                                                      clyon@agtlawyers.com
                                                      eharlan@agtlawyers.com


                                                      Lawrence S. Greenberg, Bar No. 23642
                                                      GREENBERG LAW OFFICE
                                                      6 E. Biddle Street
                                                      Baltimore, Maryland 21202
                                                      Telephone: 410.539.5250
                                                      Facsimile: 410.625.7891
                                                      larry@greenberglawyers.com


                                                      *Attorneys for Plaintiff*