# Stanford O. Franklin

5011 Norrisville Road, White Hall, MD 21161
(443) 286-6737 ph – (410) 692-2895 fx
stanfranklin@verizon.net

August 29, 2014

Thurman W. Zollicoffer, Jr.
Whiteford, Taylor & Preston
7 Saint Paul Street, Floor 13
Baltimore, Marland 21202-1626

    RE:    *Makia Smith v. BPD, et al*
               United States District Court for the District of Maryland
               Case No: 1:13-c-1352 MJG

Dear Mr. Zollicoffer:

    Attached to this letter is my expert opinion affidavit resulting from my review and analysis of the documents and KGA recordings made available to me thus far.

Sincerely,

*[signature]*

Stanford O. Franklin

# AFFIDAVIT OF STANFORD O'NEILL FRANKLIN

I, Stanford O'Neill Franklin, hereby swear upon penalty of perjury that the following statement is true and accurate to the best of my ability and based on my personal knowledge.

1. My name is Stanford O'Neill Franklin. I am a resident of the State of Maryland and a citizen of the United States of America.

2. I am currently the Executive Director of Law Enforcement Against Prohibition (LEAP), a non-profit organization that advocates for the reformation of national and international drug prohibition policies.

## I. Education

3. In 1979, I attended a General Studies Program at Loyola College of Maryland. I also took continuing education classes in Harford Community College as the need arose.

4. In 1998, I participated in and managed the Law Enforcement Executive Leadership Program at Johns Hopkins University for the Maryland State Police. The purpose of the program is to encourage law enforcement officers to continue their education and strengthen their leadership skills. The classes focused on the moral foundations for the policing profession, philosophy, and leadership skills.

## II. Awards

5. In 1999, I received a Superintendent's Salute for 23 years of dedicated service to the Maryland State Police.

6. In 2000, I received the Governor's Service Citation for all my accomplishments during my career.

7. In 2001, I received the Outstanding Service award from the Baltimore Police Department for my efforts in reforming the Department's training division during my time as Commander of the Training Bureau.

## III. Relevant Law Enforcement Experience

8. I have 34 years of law enforcement experience. From 1976 to 2010, I served the Maryland State Police, the Baltimore Police Department, and the Maryland Transit Administration Police.

9. I served the Maryland State Police from 1976 to 1999. After completing the police academy and in-service training programs, which included in-depth

material on Fourth Amendment and the law of arrest, I was assigned to the College Park Barracks in Prince George's County.  As an entry-level patrolman, I made an average of ten traffic stops every day I worked. Throughout my career, I have performed thousands upon thousands of traffic stops and have trained other officers in how to perform proper traffic stops.  I have also effectuated thousands of detentions and arrests and have trained others on how to detain and arrest properly.

10. From 1982 to 1986, I was a Field Training Officer assigned to the Glen Burnie barracks.  During this time, I supervised a team of probationary officers in training for four to six weeks at a time. I was tasked with closely supervising the trainees and making sure they followed the law and proper procedures. This included supervising the trainees while they performed traffic stops, arrests, and detentions. During this time I wrote daily progress reports for each trainee, which included an evaluation of whether the officers understood, respected, and correctly applied the laws of arrests and detentions.

11. In 1986, I was promoted to Corporal. As Corporal, I was tasked with closely supervising fieldtraining officers and ensuring they were correctly monitoring the behavior of their trainees. My work included taking corrective measures against field training officers and trainees who did not use proper arrest and detention procedures or fully respect Fourth Amendment individual rights.

12. In 1988, I was promoted to Sergeant and assigned to the Rockville Barracks as a duty officer overseeing a squad of troopers and one corporal. Again I was tasked with closely supervising field training officers and ensuring they were correctly monitoring the behavior of their trainees. One year later I was assigned to the Bureau of Drug and Criminal Enforcement. I worked in this department until 1998 (except for a two-year period of time I spent working for the Planning and Research Division of the Administrative Bureau). During this time I oversaw seven multi-jurisdictional drug task forces in the western half of the state. After being promoted to Major I managed thirteen task forces on the eastern half of the state, four criminal investigation task forces and nine drug task forces. My work included monitoring the behavior of the officers in the task forces and ensuring they followed proper arrest and detention procedures while at the same time effectively investigating criminal and drug activity.

13. In 1998, I became Major for the Education and Career Development Command. In this role, I oversaw all training for the Maryland State Police, which included entry-level training for cadets (a 26-week program in the police academy that involves in-depth coverage of and materials on law of arrest and detention), in-service training for current troopers, and coordination of the Law Enforcement Executive Leadership Program for those troopers who showed

leadership potential. Besides general management, my tasks included ensuring that all officers received quality training. I was in charge of choosing competent instructors and overseeing their curriculum creation to make sure the material being taught to officers was accurate and taught effectively.

14. It was also my job to ensure the each trainee in the entry-level training program showed proficiency in each of the training objectives required by the Maryland Police and Correctional Training Commission [hereinafter "the Commission"]. The Commission, which was created in 1966 by the Maryland General Assembly, is a state agency that oversees training for all law enforcement and correctional agencies in Maryland. The Commission provides over 500 training objectives that each law enforcement officer in Maryland must learn, no matter the agency. These objectives, of course, require that each officer learn and demonstrate proficiency in proper arrest and detention procedures and individual constitutional rights. As Major, I made sure our training program effectively taught each of our trainees these objectives.

15. During my time as Major of the Education and Career Development Command, we started redesigning the entry-level training program to be scenario-based. In addition to lecturing the trainees on the law and the defined scope of their powers, the new scenario-based curriculum allowed trainees to apply what they learned to the sort of scenarios the trainees would encounter on the job. This program integrated the theoretical piece on hard law and put it into practical demonstration. This way, the trainees learned hands-on which sort of behavior was appropriate and which behavior crossed the line and violated individual constitutional rights. While I did not write the curriculum myself, I supervised instructors who did and was responsible for final approval of the curriculum and lesson plans.

16. I retired from the Maryland State Police towards the end of 1999. My intentions were to become a private training consultant for law enforcement agencies. However, within a month after I retired, I was invited by the commissioner of the Baltimore City Police at the time to work for the force and reform their training program.

17. I accepted the job and soon became Lieutenant Colonel of the Education and Training Division. During this time I completely rebuilt the entry-level and in-service training programs to use a scenario-based curriculum similar to that I helped develop in the Maryland State Police. Again, while I was not personally involved in rewriting the curriculum, I supervised the instructors that did. I had the ultimate responsibility for ensuring the curriculum was an accurate reflection of current laws and constitutional principles. This included lesson plans on law enforcement officers' limited powers of arrest and detention.

18. In 2004, I was invited by the Chief of Police to join the Maryland Transit Administration (MTA) Police. The MTA Police is a force of a couple hundred men and women whose responsibility is to patrol all MTA properties, including bus, light rail, metro, subway, and MARC train lines and other properties, such as the stations, bus stops, and parking lots attached to them. During my time as Major and Commander in the MTA, I was responsible for overseeing case management, training and disciplinary efforts, employee evaluations, and particularly, overseeing patrol efforts by police officers. This included monitoring officer conduct during patrols and ensuring that each officer followed proper procedures when effectuating arrests and detentions.

19. I retired from law enforcement in 2010 and began working as Executive Director of Law Enforcement Against Prohibition (LEAP). LEAP is an international non-profit organization composed of law enforcement professionals that advocates for the reformation of national and international drug prohibition policies.

20. In sum, throughout my 34 years in law enforcement, I not only learned and demonstrated proficiency in proper traffic stop, arrest and detention procedures, but also closely trained, supervised, and disciplined others with regard to these procedures. I was very successful in my law enforcement career, which culminated in my heading the training departments of two different law enforcement agencies – the Maryland State Police and the Baltimore City Police – then moving on as a commander within a third law enforcement agency, the Maryland Transit Administration Police.

### IV. My Understanding of the Facts of the Case

21. I have thoroughly examined a number of relevant documents related to Makia Smith v. Baltimore Police Department [Case No.: 1:13-cv-1352]. I reviewed the formal complaint, arrest reports, statement of probable cause, IID complaint 2012-0181, photographs of Ms. Smith and Officer Church, Smith, Kennedy and Coleman depositions, CAD reports, and KGA recordings of the events occurring in the 2800 block of Harford Road, Baltimore Maryland, between 1550 and 1621 hours on March 8, 2012. My understanding of the facts of this case is derived from those materials. I understand that some facts differ between Ms. Smith's testimony and Officer Church's reports and testimony. I will be analyzing the facts of this case in the most objective manner possible, relevant to Maryland law, police training, policy and procedure.

22. I understand that on March 8, 2012, at approximately 1550 hours, Officer's Church, Campbell and Pilkerton were attempting to arrest a juvenile for disorderly conduct in the 2800 block of Harford Road, Baltimore Maryland, by

the Clifton Park Golf Course. Having been raised in Baltimore City and having policed there as well, I am very familiar with this location.

23. According to Baltimore Police radio dispatch, KGA, at approximately 1550 hours unit 12 radioed KGA for additional units to assist with juveniles in the area of Harford and Hillen Roads. Units 11 and 14 responded. At 1555 hours unit 11 responded in an excited state to KGA advising to standby. KGA asked if everything was OK. Not receiving a response from units on the scene, KGA requested that unit 92 respond to the location. Unit 11 then responds that he has one in custody. A signal 13 was then called at 1556 and cleared just moments later. At 1600 hours unit 92 (wagon) advises that he has a female onboard. Prior to unit 92 advising that he had a female on board, five units (12, 11, 14, 17 and 32) had reported being on the scene. Units 10, 22 and 20 were still en-route.

24. In Officer Church's arrest report of Ms. Smith, he indicated that as he was assisting Officer Jackson with the arrest of a juvenile, he observed a vehicle stop in the travel lane of Harford Road. From that vehicle a Black female, later identified as Ms. Smith, exited the vehicle shouting that she was not going to let them beat up that boy. She displayed her cell phone as though recording the event as horns from vehicles behind hers began to blow. Officer Church approached her vehicle, asked her to move and she refused to comply, saying, "I ain't moving shit." Officer Church asked a second time and she repeated the first reply adding, "Y'all beating that boy up for no reason." At this moment the encounter became a traffic stop with Officer Church demanding to see her drivers license. Ms. Smith refuses to display her license and attempts to close her car door striking Officer Church on the arm with the door while doing so. Officer Church orders Ms. Smith out of the vehicle and she again refuses to comply with a lawful order for a third time. He physically removes her from the vehicle, she begins to resist and fight using her arms and legs striking Officer Church on the right side of his neck with her fist. Officers Pilkerton, Ulmer and Campbell then assisted with restraining her and the arrest. The crime lab was later summoned to take photos of both Officer Church and Ms. Smith. Officer Church had what appears to be an abrasion on the right side of his neck and left upper forearm. Ms. Smith has redness on the bridge of her nose.

25. During Ms. Smith's deposition, much of her statement is similar to Officer Church's arrest report. Ms. Smith stated that she was traveling north on Harford Road approaching Hugo Avenue when she noticed the excitement of children running. She said that traffic was stop and go and that her car was eventually in a position directly across from the officers and she could see what was occurring. She stated that she stopped in the road when she saw the

officers surrounding what appeared to be a 12 or 13-year-old boy with an officer's knee on the boy's head. She stated that she stopped to video record the incident and that an officer yelled at her, "What are you doing?" She then states that she answers him and he says for her to get back in her car. She states that she is in the middle lane next to the curb lane. She states that she was trying to get back into the car when he came running around the car to her, grabbed her cell phone, threw it to the ground and kicked it. He then pulled her out of the car, tossed her around with the assistance of other police officers and arrested her. She also stated that she could not move her car because traffic was completely stopped due to kids and police cars blocking traffic. This is one area where the two versions differ.

26. Ms. Renee Coleman, a listed witness to the event, stated during her deposition that she heard the commotion of the police officers interacting with the juveniles and she came out of her salon to see what was occurring. Regarding the interaction between Officer Church and Ms. Smith, she stated that traffic was stopped and she saw Ms. Smith standing outside of her car and that she appeared to be recording the event with her cellphone. She said that she saw the officers approach her, Ms. Smith got back into her car, there was what appeared to be conversation, the officer pulled Smith from the car and was assisted by the other officers in arresting Smith.

27. Ms. Coleman also described the traffic situation. She stated that traffic was stopped on the north side of Harford Road, not on the southbound side where she was. She stated that there were cars parked along the north side. This means that there would be two north bound travel lanes, a left turn lane and two open southbound lanes.

28. Ms. Tricezette Kennedy, another witness, stated during her deposition that she was driving in traffic behind Ms. Smith when traffic stopped due to the police activity to their right. She stated that everyone was looking to the right. She stated that Ms. Smith was the only person she saw get out of any vehicle at that time. She said that Ms. Smith stood in the doorframe of her car and appeared to be filming the police. At this time an officer approached Ms. Smith, Ms. Smith sat back down in her car and the officer grabbed her cellphone. He then began removing Ms. Smith from the car. At the same time, Ms. Kennedy began driving around Ms. Smith's car. Ms. Kennedy stated that there was a lane to the left that people were using to drive around the police vehicles.

29. Ms. Kennedy stated that she drove around Smith's car, around the police vehicles, legally parked in front of them, got out of her car and walked back to the location where the police were arresting Ms. Smith. She did this literally within moments after the police officer initially confronted Ms. Smith.

30. 

31. 

32. Above are two October 2011 Google Maps photographs of the 2800 block of northbound Harford Road, Baltimore, Maryland, #30 at Harford Road and Hugo Avenue and #31 at Harford Road and Fenwick Avenue. On the right side of both photographs are trees on a slight hill. Either of these could be the tree depicted by Ms. Smith during her deposition. This is relevant because it identifies locations on Harford Road where are six lanes across with no center concrete curb or barrier to prevent vehicles from driving around any stopped police vehicles. According to the statements of both Ms. Smith and Ms. Kennedy, in addition to the KGA recordings, I believe that the exact location is figure 30, Harford Road at Hugo Avenue. Ms. Smith mentioned Hugo Avenue as the cross street she was approaching and Ms. Kennedy referred to the store across the street, which use to be a 7 Eleven convenience store.

### V. My Understanding of the Relevant Law

33. Maryland law enforcement officers have great, but limited, power. Police officers get this power, which is reserved only for police, from Maryland statutes, such as the Maryland Code of Transportation. Each law enforcement agency then crafts rules that govern officer behavior within the limits set out by statute. It is very important for Maryland law enforcement officers to recognize that their unique powers over ordinary people are limited. The rules are carefully crafted to keep an officer's natural prejudices from influencing the way he or she applies the rules. If the rules are not followed, individual police officers may be tempted to give in to prejudices and abuse their power.

34. Official police interaction with civilians should always be limited to the task at hand. An officer can only detain an individual when the officer has reasonable suspicion to believe the individual is involved, or about to be involved in criminal activity, or has probable cause that they have committed a crime and therefore, subjected to arrest. In this case, specific motor vehicle laws are relevant and referred to in my conclusions.

### VI. My Conclusions

35. Questions to be answered are as follows. Did Officer Church have probable cause to perform a traffic stop on Ms. Smith? Could Ms. Smith have continued on her way either before, or after being ordered by the police officer to do so? Did he have reasonable belief that a traffic violation had been committed by Ms. Smith in his presence? If so, was Ms. Smith required by law to display her driver's license when requested to do so by Officer Church? Did she display it? Is it lawful for Officer Church to order her out of the vehicle once she failed to comply with two previous lawful directives? Is it a lawful arrest once she has failed to comply with a directive to move her vehicle, display her license upon demand and to exit her vehicle when directed to do so?

36. According to Officer Church's depiction of the incident and that of Ms. Smith, she did cause her vehicle to stand in the travel lane of Harford Road next to a vehicle parked next to the curb. It is my professional opinion that Ms. Smith contributed to the traffic problem by completely stopping her car and getting out of it, when she could have remained in her car navigating to the left through the open lane. It is not reasonable to believe that the police blocked three open northbound lanes of traffic (two north and one left turn lane) with their vehicles for an event occurring on the sidewalk. Ms. Kennedy testified to this fact during her deposition. She stated that traffic was moving by the incident in a lane to the left. No police vehicles had been moved from this lane anytime during the incident, which means the lane was always available for

vehicular movement. It is reasonable to believe that vehicles traveling north on Harford Road at Hugo Avenue were navigating to the left around the stopped police vehicles in this lane during the entire duration of the incident.

37. If Ms. Smith managed to gain her visual advantage point in stop and go traffic, she could have continued to move forward by maneuvering to the left. Ms. Smith stated that she even removed her key from the ignition. This act is in direct violation of the Maryland Code of Transportation § 21-1003 Stopping, Standing, or Parking Prohibited in Specified Places, paragraph (r), which states, "A person may not stand or park a vehicle on the roadway side of any other vehicle that is stopped or parked at the edge or curb of a highway." Additionally, § 21-103 Obedience to Police Officers and Summonses, paragraph (a) states, "A person may not willfully disobey any lawful order or direction of any police officer."

38. It is also reasonable to believe that Officer Church demanded Ms. Smith to display her driver's license and she refused to do so. This is in violation of Maryland Code of Transportation § 16-112 License to be Carried and Exhibited Upon Demand, paragraph (c), which states, "Each individual driving a motor vehicle on any highway in this state shall display the license to any uniformed police officer who demands it." At this point, Officer Church has more than enough probable cause for the arrest of Ms. Smith. Officer Church removed Ms. Smith from her vehicle, a struggle ensued where both Ms. Smith and Officer Church received minor injuries, and with the assistance of other officers, handcuffed her in preparation for transport.

39. Based on my understanding of the law and my extensive law enforcement experience, it is my expert opinion that Officer Church had the legal authority to confront Ms. Smith, to order her to proceed on her way, request the display of her driver's license once she refused to move her car and eventually arrest Ms. Smith for the aforementioned violations of Maryland law. In analyzing the accounts of the incident, Officer Church conducted the arrest and everything leading up to it inline with Maryland law and Baltimore Police Department policy.

Signature: _____    Date: August 29, 2014