FILED: October 27, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

No. 15-1604
(1:13-cv-01352-JFM)

───────────────

MAKIA SMITH

        Plaintiff - Appellant

v.

BALTIMORE CITY POLICE DEPARTMENT; ANTHONY W. BATTS, in his
official capacity as Commissioner of the Baltimore City Police Department;
OFFICER NATHAN CHURCH, in both his official and individual capacity as an
officer of the Baltimore City Police Department; OFFICER KENNETH
CAMPBELL, in both his official and individual capacity as an officer of the
Baltimore City Police Department

        Defendants - Appellees

and

OFFICER WILLIAM PILKERTON, JR., in both his official and individual
capacity as an officer of the Baltimore City Police Department; OFFICER
NATHAN ULMER, in both his official and individual capacity as an officer of the
Baltimore City Police Department

        Defendants

## J U D G M E N T

In accordance with the decision of this court, the judgment of the district court is reversed. This case is remanded to the district court for further proceedings consistent with the court's decision.

This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41.

/s/ PATRICIA S. CONNOR, CLERK

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

## No. 15-1604

MAKIA SMITH,

Plaintiff - Appellant,

v.

BALTIMORE CITY POLICE DEPARTMENT; ANTHONY W. BATTS, in his
official capacity as Commissioner of the Baltimore City
Police Department; OFFICER NATHAN CHURCH, in both his
official and individual capacity as an officer of the
Baltimore City Police Department; OFFICER KENNETH CAMPBELL,
in both his official and individual capacity as an officer
of the Baltimore City Police Department,

Defendants - Appellees,

and

OFFICER WILLIAM PILKERTON, JR., in both his official and
individual capacity as an officer of the Baltimore City
Police Department; OFFICER NATHAN ULMER, in both his
official and individual capacity as an officer of the
Baltimore City Police Department,

Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    J. Frederick Motz, Senior District
Judge.   (1:13-cv-01352-JFM)

Argued: September 20, 2016          Decided: October 27, 2016

Before KEENAN, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Keenan and Judge Floyd joined.

---

**ARGUED:** Lawrence S. Greenberg, GREENBERG LAW OFFICE, Baltimore, Maryland, for Appellant. Suzanne Sangree, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:** Zebulan P. Snyder, GREENBERG LAW OFFICE, Baltimore, Maryland, for Appellant. George Nilson, City Solicitor of Baltimore City, William R. Phelan, Chief Solicitor, Glenn Marrow, Chief of Police Legal Affairs Division, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

---

THACKER, Circuit Judge:

Makia Smith ("Smith" or "Appellant") sued the Baltimore City Police Department ("BCPD") and several individual officers pursuant to 42 U.S.C. § 1983 and Maryland law. Smith claimed two officers battered and unlawfully arrested her after they saw her filming them as they arrested a juvenile. At trial, the district court allowed defense counsel to elicit testimony that Smith had been arrested three times before. The jury ultimately returned a verdict in favor of the two officers on all counts.

We fail to see how Smith's prior arrests were relevant to her claim for damages, which was the sole reason the district court admitted them, and any probative value of those arrests was far outweighed by prejudice to Smith. The admission of such evidence was prohibited by Federal Rule of Evidence 404(b) and was not harmless. Therefore, we reverse and remand for a new trial.

I.

A.

Officer Nathan Church of the BCPD testified to the following facts at the trial. On Friday, March 8, 2012, just as high school students were being released from school, Officer Church received a call for back-up to the 2800 block of Hartford Road in Baltimore. He arrived to find several juveniles running

3

through the streets and another officer, Talmadge Jackson, attempting to arrest one of them. When Officer Church arrived, the juvenile was giving Officer Jackson a struggle. Officer Church and several other officers formed a "half-horseshoe" barrier between the public and Officer Jackson to "keep other juveniles from getting close to [Officer Jackson]." S.J.A. 7.[1]

Meanwhile, Officer Church heard tires screeching and turned to see multiple vehicles stopped on Hartford Road. He testified that traffic was stopped and/or moving extremely slowly, and Smith's car was "blocking all the traffic behind her." S.J.A. 10-11. Smith was standing outside of her car with her phone up as if videotaping. Officer Church, over 50 feet away from Smith, yelled, "Ma'am, pull your car to the side or keep on going." Id. at 11. Smith replied, "I'm not going to let you hurt that young boy. I ain't moving -- I ain't moving [shit]." Id.

Officer Church "quickstep[ped]" toward Appellant and again told her to move, and she responded, "I'm not moving [shit]. [Fuck] y'all." S.J.A. 13-14. Officer Church moved closer, told her this was a traffic stop, and asked for her license. Smith "ran back into her car" and sat with her back

---

[1] Citations to the "S.J.A." refer to the Supplemental Joint Appendix filed by the parties in this appeal.

4

toward the passenger door, which Officer Church described as "not normal[]" and indicative of someone "trying to flee from the scene." Id. at 17-19. At that point, Officer Church reached in the car and was trying to grab for her keys, but Appellant began "kicking [him], throwing fists at [him], [and] scratching [him]." Id. at 19. At one point he was "being hit with a[n] [unidentified] hard object." Id. He placed his right arm on the vehicle and reached in the car with his left arm, "just trying to grab her and pull her out of the car." Id. She was "flailing" and Office Church was "keeping [his] face . . . out of harm's way." Id. at 22. Officer Church succeeded in pulling Smith out of the car, but he did not know what he grabbed onto, whether it was her hair or something else. He handcuffed her and began to effect an arrest. Pictures of Officer Church with visible red marks and scratch marks on his arm and neck were admitted into evidence.

Smith's version of the facts is quite different. According to her, while she was driving with her two-year-old daughter on Hartford Road, she saw Officer Jackson arresting the juvenile and became concerned when she saw the officer's "knee pressed against his temple." J.A. 94.[2] She got out of her

_____

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

5

vehicle, took the keys out, and pulled her cell phone up as if videoing what the officers were doing. Officer Church yelled, "What are you doing?" and Smith replied, "I'm just trying to make sure that you guys are not hurting that little boy and trying to make sure that he's okay." Id. at 97.

At that point, Officer Church "started coming towards the vehicle . . . [l]ike The Incredible Hulk, like Manny Pacquiao . . . in an aggressive . . . manner," and once he got closer to the vehicle, he started running. J.A. 97. Smith tried to get back in the car, but at that point, she could not have driven anywhere because traffic was still stopped. Officer Church came over to the car, "snatched the phone out of [her] hand and he kicked it and he stomped it." Id. at 99. He then said, "You want to film things, B[itch], film this. I should knock your teeth out." Id. Smith had one foot in the car and tried to get her other foot in the car when Officer Church "took both of his hands and dragged [her] out of the car" by her hair. Id. She did not punch, scratch, or kick Officer Church before he grabbed her hair because "that kind of thinking gets you killed," although she admitted to "flailing" to try and get Officer Church off of her. Id. at 101-02. Then she felt three or four other people join in but could not really see them. She felt someone hit her in the back of the head and then she "just blacked out." Id. at 102. The next thing she remembered is

6

being slammed onto the car and then seeing her daughter crying. Another officer, Officer Campbell, pulled her left arm back and all the way up and said, "Did you have enough yet?  Do you want me to break it?"  Id. at 103.

As they began to arrest her, Smith asked Officer Church if she could call her mother to come get her baby. Officer Church taunted, "No.  Child Protective Services will be here to get your daughter."  J.A. 105.  Smith asked a bystander if she could come get her daughter out of the car, and the bystander did so.  The officers put Smith in the patrol car, and she began yelling out her mother's phone number; another officer finally gave the bystander her mother's phone number.

Smith was taken away in the transport vehicle to a central booking station.  Because she was complaining of head and neck pain, she was taken to a nearby hospital before booking.  She was eventually charged with second-degree assault of Officer Church, resisting or interfering with arrest, failing to display a license on demand, willfully disobeying a lawful order of the police, and causing a vehicle to obstruct a free vehicle passage of a roadway.  On January 3, 2013, after nearly a year of pre-trial release obligations, the charges against Smith were dropped via a nolle prosequi disposition.

7

B.

On May 8, 2013, Smith filed the instant action in the District of Maryland against the BCPD; Anthony Batts, Commissioner of the BCPD; Office Church; Officer Campbell; and two other officers at the scene, William Pilkerton and Nathan Ulmer (collectively, "Appellees"). The operative complaint, amended on October 9, 2014, alleged 13 counts: excessive force, deprivation of property without due process, and violations of the First and Fourth Amendments under 42 U.S.C. § 1983; violation of attendant rights under the state constitution; Monell[3] claims against the city; and state law claims of conversion, battery, false arrest, false imprisonment, and intentional infliction of emotional distress. Smith claimed a minimum of $1.5 million in damages for, inter alia, "emotional trauma, humiliation, distress, bodily injury and damage to personal property." J.A. 37-38.

The original district court judge to whom the case was assigned granted summary judgment to Officers Pilkerton and Ulmer on some of the counts and determined the case should be tried in two phases. First the jury would consider claims against Officers Church and Campbell, and then, the Monell claims against the city would proceed in a second phase if the

---

[3] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

8

jury determined any constitutional harm had occurred.   As a
result, at the trial underlying this appeal, only five claims
proceeded against Officer Church -- the First Amendment, Fourth
Amendment, excessive force, battery, and false arrest claims --
and two claims against Officer Campbell -- the excessive force
and battery claims.

Notably, on March 9, 2015, Smith filed a motion in
limine to exclude "all evidence or discussion of [Appellant's]
prior arrests."  J.A. 81.   Smith had been arrested three times:
for second degree assault in 2005, fleeing and eluding in 2006,
and second degree assault in 2010.[4]  No convictions followed any
of Smith's prior arrests.   The district court granted the motion
on March 11, explaining, "There shall be no reference [at trial]
to [Appellant]'s prior arrests."   Id. at 86.   On March 26, the
case was reassigned to a new district court judge and proceeded
to trial.

During the three-day trial in March 2015, the
following relevant exchanges occurred.   First, at a bench
conference on March 25, directly before Smith's mother testified
on her behalf, Appellees' counsel said, "I expect plaintiff's
counsel to elicit [testimony from Smith's mother of] pain and

---

[4] The motion also mentioned a fourth arrest, which was not
presented to the jury.

9

suffering after the event, [but] one of the Motions in Limine is that we are not allowed to go into prior arrests.  . . . [I]f [plaintiff's counsel] go[es] into it, I believe they opened the door."  S.J.A. 79.  The court explained to Smith's counsel, "I haven't heard the testimony yet.  But be forewarned.  It makes sense to me."  Id. at 80.

> Smith's mother then testified as follows:

> Following the incident, . . . Makia cried every day.  She held onto [her daughter] and continued to apologize to her for what had happened.  You know, she was, "I'm sorry.  I didn't know that was going to happen.  I'm sorry."

> . . . .

> She didn't eat, and at night she would just be up crying . . . in her room crying.

> . . . .

> Her eyes would practically close where she just continued to cry and be depressed and sad.

Id. at 83-84.  Later that day, just before Smith testified, Smith's counsel reiterated at a bench conference that the prior arrests should not come in.  The district court explained,

> I have tremendous respect for [the judge who originally ruled on the motion in limine].  He has not heard the evidence.  He didn't hear the mother give overemotional testimony which    was    shaded    with    hearsay . . . .

> I am letting it in.  I think it goes to whether or not she really suffered pain and

suffering from this incident. So I'm letting it in for that reason.

Id. at 87. The court added, "I think [the original judge] is right, you don't attack somebody's credibility by an arrest and not a conviction, but I'm letting it in." Id.

During Appellant's testimony that same day, the following exchange took place:

> **[SMITH]**: Every time I see a officer now, I immediately tense up. I remember once my taillight was out and I got pulled over, I was like extremely scared. Every time I see anything that goes on on TV, I kind of get upset because I really trusted in the officers. I was raised to respect officers and that they were people that should be respected, and I kind of was let down.
>
> **BY [Smith's counsel]**:
>
> **Q**. Had you ever had an interaction like this with an officer before?
>
> **A**. No.
>
> **Q**. Not just the Baltimore City Police Department, but anywhere?
>
> **A**. No.
>
> **Q**. What you just described, the problems you had, do you still have those problems?
>
> **A**. Most definitely.

J.A. 118 (emphasis supplied).

\*      \*      \*      \*

Then, during cross-examination, the following testimony occurred:

11

**BY [BCPD's counsel]:**

**Q.** Ma'am, you said you were traumatized by this event; is that correct?

**A.** I think anybody would be.

**Q.** Okay. And you also testified that you were brought up to have respect for police and now you feel a little different; is that correct?

**A.** I don't feel that they shouldn't be respected. I feel like I was let down by them.

**Q.** You also remember when I had an opportunity to speak to you in my office, I asked you, I said this wasn't your first rodeo, was it?

**[Smith's counsel]:** Objection.

**THE COURT:** Let me tell you, it's important -- I think I know where [BCPD's counsel] is going, and I'm overruling the objection, which is understandable.

If the plaintiff -- am I right, the rodeo means arrest?

**[BCPD's counsel]:** That's correct, Your Honor.

**THE COURT:** If the plaintiff was arrested and the charges were dismissed, which is, I think, what happened, you can't use an arrest, and it's essential that you understand that. You cannot use the mere fact of an arrest to judge the plaintiff's credibility. That is absolutely essential.

Rightly or wrongly, having heard the testimony, I think that since the plaintiff says this has had such an effect on her that the fact of the arrest may be relevant to the amount of damages, if any, that she suffered. So that I'm letting it in.

12

> But please understand that you cannot consider an arrest to judge the plaintiff's credibility. That's absolutely against the rules, and it's a good rule, because they haven't -- you know, there hasn't been a trial. And there's an objection to this, and that's understandable.
>
> . . . .
>
> **[Smith's counsel]:** And in addition to the prior ruling from [the original judge] that you --
>
> **THE COURT:** [He] made his ruling, but [he] hadn't heard the testimony.
>
> **[Smith's counsel]:** Okay.
>
> . . . .
>
> **BY [BCPD's counsel]:**
>
> **Q.** When you were in my office, I asked you, I said this wasn't your first rodeo, was it?
>
> . . . .
>
> **[SMITH]:** Yes, I have been arrested before.
>
> **Q.** Right. And, matter of fact, when I asked you how many times, you said, "Two. No, I think three"; correct?
>
> **A.** I think so.

J.A. 133-35.

*     *     *     *

Appellees did not ask any further questions about the prior arrests. But on redirect examination, Smith's counsel asked about the nature of the prior arrests. As to the first (second degree assault), Smith explained the father of her child sent his girlfriend "to beat [her] up," and she merely defended

13

herself. J.A. 136. The second (fleeing and eluding) occurred when an officer tried to her pull her over, and she kept driving to pull into a lit area, rather than a dark area. The officer arrested her, but when she explained herself, he apologized. Finally, as to the third arrest (second degree assault), the father of her child showed up in the middle of the night and dragged her baby out of the house in her car seat, threw her out into the grass, and "tousl[ed]" Appellant around, and again, Appellant defended herself. Id.

The jury returned a verdict in favor of Officers Church and Campbell on all counts on March 30, 2015.[5] Appellant moved for a new trial, raising an unrelated issue, but her request was denied. She then filed this appeal, raising only one issue: whether the district court committed reversible error in admitting evidence of Appellant's prior arrests.

II.

We review the district court's evidentiary decisions for abuse of discretion. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010). An abuse of discretion occurs only

---

[5] The district court later entered judgment in favor of BCPD and Batts pursuant to City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that where no underlying constitutional violation occurred, the city cannot be liable under Monell). See Order, Smith v. Baltimore City Police Dep't, No. 1:13-cv-1352 (D. Md. June 17, 2015), ECF No. 165.

14

when the district court acts "arbitrarily or irrationally" in admitting evidence. United States v. Benkahla, 530 F.3d 300, 309 (4th Cir. 2008) (internal quotation marks omitted). Such evidentiary rulings are, however, "subject . . . to harmless error review." United States v. Johnson, 587 F.3d 625, 637 (4th Cir. 2009). "Where error is founded on a violation of Rule 404(b), the test for harmlessness is whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994) (internal quotation marks omitted).

### III.

This appeal turns on whether the fact that Smith was arrested three times before -- with no evidence that her prior arrests involved a struggle of any kind with police and with no convictions stemming from the arrests -- makes it more or less probable that she suffered emotional damages in the case at hand, where the police allegedly cursed at her, beat her, and threatened to turn her child over to Child Protective Services. We think not, and indeed, the admission of that fact could easily have tipped the scales in what the district court itself called "a tough case" that boiled down to a classic he-said, she-said dispute. J.A. 158.

15

A.

Federal Rule of Evidence 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Prior act evidence is admissible, however, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

We utilize a four-part test to assess admissibility of prior-act evidence: "(1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the [claim]; (3) it must be reliable; and (4) its probative value must not be substantially outweighed by its prejudicial nature." United States v. Garcia-Lagunas, --- F.3d ---, 2016 WL 4547206, at *9 (4th Cir. Sept. 1, 2016) (alteration and internal quotation marks omitted). In her opening brief, Smith only questions the relevance and prejudicial nature of the prior arrests, so we limit our discussion to those two issues.

1.

Relevance

It is well established that "a witness, whether a party or not, may not be asked questions as to irrelevant

16

matters on cross-examination for the purpose of . . .
discrediting [her]." United States v. Chase, 372 F.2d 453, 463
(4th Cir. 1967). Generally, "[r]elevant evidence is admissible"
unless otherwise prohibited by the Constitution, the Rules of
Evidence, statutes, or other rules prescribed by the Supreme
Court. Fed. R. Evid. 402. Evidence is relevant if "it has any
tendency to make a fact more or less probable than it would be
without the evidence," and "the fact is of consequence in
determining the action." Fed. R. Evid. 401(a), (b).

Under Rule 404(b), "admission of evidence of other bad
acts to assist the jury in measuring the extent of damages is a
legitimate, non-character-based use of such evidence." Udemba
v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001) (citing Lewis v. Dist.
of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986)) (emphasis
supplied). But that evidence still must have "probative value
on the question of . . . damages" in the case at hand. Nelson
v. City of Chicago, 810 F.3d 1061, 1069 (7th Cir. 2016)
(internal quotation marks omitted).

In Nelson, the plaintiff, Larry Nelson, sued officers
and the City of Chicago pursuant to § 1983 when Chicago police
officers pulled him over, pointed a gun at him, threatened to
kill him, and searched his car for no apparent reason. See
Nelson, 810 F.3d at 1064. At trial, the district court allowed
defense counsel to introduce Nelson's arrest record, which

17

included nine arrests between 1983 and 1999 and one in 2005. See id. at 1066.

Nelson moved in limine to exclude the evidence of prior arrests, but then he testified about his emotional distress during the traffic stop, explaining, "I was terrified, humiliated . . . I feared for my life." Nelson, 810 F.3d at 1067. The court then granted defense counsel's request to introduce the prior arrest evidence, but explained it could only come in for impeachment purposes and "on the theory that some of [Nelson's] fear of the police may have been attributable to his earlier arrests." Id. at 1067-68. The district court gave no limiting instruction, although it prohibited mention of the evidence in closing argument. The jury returned a verdict in favor of the police. See id. at 1065-66.

The Seventh Circuit found reversible error. First, it concluded the evidence was not relevant. The theories that his arrest history "mitigated his fear during the traffic stop" or "augmented it," were "tenuous at best," and the arrest history had "miniscule probative value on the question of his damages." Nelson, 810 F.3d at 1068-69 (emphases in original) (internal quotation marks omitted). Indeed, "the arrests were distant in time," and "Nelson carefully limited his claimed emotional injury to the fear he felt during the 30 minutes of the traffic stop itself." Id. at 1069; see also id. ("Although [Nelson]

18

said he remained angry about the incident despite the passage of time, he never claimed that the experience left him fearful of the police more generally."). The court also warned that allowing such evidence in § 1983 cases "would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case." Id. (quoting Barber v. City of Chicago, 725 F.3d 702, 715 (7th Cir. 2013)).

The court then decided the error was not harmless: "The jury heard that Nelson had been arrested numerous times, making him appear particularly unsympathetic. The trial turned entirely on his credibility, so the harm caused by improperly admitting this damaging evidence would naturally be substantial." Nelson, 810 F.3d at 1070. And even though defense counsel only asked one question and elicited only the fact of the prior arrests, the court explained, "[T]hat single question was especially damning, referring to 'numerous' prior arrests." Id.

Some decisions involving prior arrests allegedly bearing on damages, however, have gone the other way. See, e.g., Udemba, 237 F.3d at 15 (in § 1983 appeal, affirming district court's finding that evidence of subsequent arrest was

19

relevant to a contested issue in the case -- the extent of damages attributable to emotional distress); Karnes v. Skrutski, 62 F.3d 485, 500 (3d Cir. 1995) (finding no abuse of discretion in admitting evidence of prior arrest in § 1983 action where plaintiff contended that the underlying incident diminished his respect for police and, thus, caused him damage), abrogated on other grounds as recognized in Curley v. Klem, 499 F.3d 199 (3d Cir. 2007); Montoya v. Sheldon, 898 F. Supp. 2d 1259, 1273 (D.N.M. 2012) (allowing evidence of prior arrests in § 1983 action, explaining they "are relevant to the issue of [plaintiff's] emotional distress damages, because the amount of times and the manner in which [plaintiff] had been arrested . . . makes more or less probable the Defendants' arrest emotionally distressed him").

Considering Smith's argument "with meticulous regard to the facts of [her] case," United States v. Hernandez, 975 F.2d 1035, 1040 (4th Cir. 1992) (internal quotation marks omitted), we find this case on par with Nelson, and we find the reasoning of Nelson to be sound. Like Nelson, Smith did not claim damages because she is now more fearful of police generally; in fact, her testimony at trial was that she felt "let down by them" but still thought they deserved respect. J.A. 133. Rather, in her Amended Complaint she claims damages for the allegedly unlawful arrest and use of excessive force

20

that occurred on March 8, 2012, and emotional damages stemming from that encounter. See id. at 37 (claiming damages for "emotional trauma, humiliation, distress . . . suffered from the acts of the Defendants" (emphasis supplied)).

Appellees' relevance argument also falls apart given the backdrop of Smith's testimony. First of all, on direct examination, Smith clearly testified she had "[n]ever had an interaction like this with an officer before." J.A. 118 (emphasis supplied). Rather than try and disprove this testimony, defense counsel pointedly asked Smith if this was her "first rodeo," J.A. 133, a question that Baltimore City Law Department's own appellate counsel admitted was "a very poor way of asking her whether she had been arrested before," Oral Argument at 19:01, Smith v. Baltimore City Police Dep't, No. 15-1604 (4th Cir. Sept. 20, 2016), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. This is a clear indication that the evidence was being used to show character and propensity, rather than to demonstrate the extent of her damages.

Perhaps most damning to Appellees' position, however, is not what defense counsel said, but what he failed to say. Appellees made no record of -- and the district court did not inquire -- whether these prior arrests were of a similar nature to the case at hand. "There is, after all, a material

21

difference between being arrested and being subjected to
excessive force in the course of that arrest." Sanchez v. City
of Chicago, 700 F.3d 919, 931 (7th Cir. 2012). And by eliciting
the mere fact of Smith's three prior arrests with no further
details, the jurors were permitted to fill in the gaps
themselves and let their imaginations run wild.

In sum, the district court did not determine whether
the three prior arrests involved conduct remotely similar to the
arrest in this case; Smith is claiming damages specifically for
the alleged conduct of the March 8, 2012 arrest; and defense
counsel's questioning reveals the evidence was admitted for
purposes of credibility, propensity, and character of Smith.
Therefore, based on this record, the evidence was irrelevant to
damages, and the district court abused its discretion in
admitting it.

2.

### Prejudice

Even if the prior arrests possessed a trace of
probative value, we find the risk of prejudice from the mention
of the prior arrests to be "enormous." Nelson, 810 F.3d at
1069. For one thing, it is common sense that "evidence of prior
arrests . . . generally impugns character." Id. And "[i]t's
doubtful that the jury drew the distinction between an arrest
and a legal finding of wrongdoing[.]" Id.

22

Of course, prejudice may be mitigated by "carefully framed" limiting instructions regarding "proper consideration of [the] evidence." United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013); see also Sanchez, 700 F.3d at 932 (assuming error occurred with admission of statement that § 1983 plaintiff had been arrested "several" times in the past, finding no harm where court "gave a limiting instruction admonishing the jury that it was to consider this evidence only insofar as it shed light on the extent of any emotional harm he experienced"). But assuming limiting instructions in this type of case are even effective,[6] here, we cannot say the instructions were carefully framed or sufficiently explained how the jury should have properly considered the evidence. Rather, they afforded "meager protection" at best. United States v. Johnson, 617 F.3d 286, 297 (4th Cir. 2010).

The court gave the following instructions to the jury during Smith's testimony:

> If the plaintiff was arrested and the charges were dismissed, which is, I think, what happened, you can't use an arrest, and it's essential that you understand that.

---

[6] Cf. United States v. Jones, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring) ("Telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom.").

23

You cannot use the mere fact of an arrest to judge the plaintiff's credibility. That is absolutely essential.

Rightly or wrongly, having heard the testimony, I think that since the plaintiff says this has had such an effect on her that the fact of the arrest may be relevant to the amount of damages, if any, that she suffered. So that I'm letting it in.

But please understand that you cannot consider an arrest to judge the plaintiff's credibility. That's absolutely against the rules, and it's a good rule, because they haven't -- you know, there hasn't been a trial.

J.A. 134-35.[7] This was the universe of the instruction, since the district court did not give a limiting instruction in the jury charge before deliberations. The court mentioned only credibility and nothing about "character," which is also forbidden use of the evidence and is listed in the text of Rule 404(b) itself, or "propensity to break the law," which is prohibited under our case law, and which became a central issue in this trial. United States v. Young, 248 F.3d 260, 271 (4th Cir. 2001). And while the court instructed the jury to consider the testimony on the issue of damages, it did not confine the

---

[7] Appellees claim Smith did not properly object to the limiting instruction. However, directly after the district court gave the instructions above, Smith's counsel noted his "continuing objection," to which the district court responded, "Oh, you have an absolutely continuing objection." J.A. 134. We find this sufficient to preserve the argument for our review.

24

jury's consideration to that issue. Thus, prejudice in this case far outweighed any perceived probative value of the three arrests.

B.

Having found error, we must now consider whether it is harmless, i.e., "whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994) (internal quotation marks omitted).

We cannot say with fair assurance the judgment was not substantially swayed by the admission of Smith's prior arrests. Smith's and Officer Church's accounts of their interaction were extremely different. The main issues in the case -- who assaulted whom, whether probable cause to arrest existed, whether the force used by Officer Church was justified -- hinged on which witness the jury believed, making the trial a classic he-said, she-said dispute. The district court itself admitted this was a "tough case." J.A. 158. Thus, the jury's view of Smith's credibility and character was necessarily central to its verdict.

Once the jury heard the evidence, it is reasonable that they assumed "where there's smoke, there's fire." Nelson, 810 F.3d at 1069. And again, the limiting instructions in this

case failed to mitigate the prejudice naturally flowing from this questioning. Cf. Barber, 725 F.3d at 717 ("At some point judicial presumptions must give way to commonsense, and the formulaic recitation of a pro forma limiting instruction may not suffice to cure an error as it may fail to instruct the jury meaningfully as to what it legitimately may do with the evidence."). Therefore, the error in this case was not harmless and requires reversal.

IV.

For the foregoing reasons, we reverse the judgment below and remand for a new trial.

REVERSED AND REMANDED

FILED: October 27, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1604,     Makia Smith v. Baltimore City Police Dept.
                 1:13-cv-01352-JFM

---

NOTICE OF JUDGMENT

---

Judgment was entered on this date in accordance with Fed. R. App. P. 36. Please be advised of the following time periods:

**PETITION FOR WRIT OF CERTIORARI:** To be timely, a petition for certiorari must be filed in the United States Supreme Court within 90 days of this court's entry of judgment. The time does not run from issuance of the mandate. If a petition for panel or en banc rehearing is timely filed, the time runs from denial of that petition. Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons. (www.supremecourt.gov)

**VOUCHERS FOR PAYMENT OF APPOINTED OR ASSIGNED COUNSEL:** Vouchers must be submitted within 60 days of entry of judgment or denial of rehearing, whichever is later. If counsel files a petition for certiorari, the 60-day period runs from filing the certiorari petition. (Loc. R. 46(d)). If payment is being made from CJA funds, counsel should submit the CJA 20 or CJA 30 Voucher through the CJA eVoucher system. In cases not covered by the Criminal Justice Act, counsel should submit the Assigned Counsel Voucher to the clerk's office for payment from the Attorney Admission Fund. An Assigned Counsel Voucher will be sent to counsel shortly after entry of judgment. Forms and instructions are also available from the clerk's office or from the court's web site, www.ca4.uscourts.gov, or from the clerk's office.

**BILL OF COSTS:** A party to whom costs are allowable, who desires taxation of costs, shall file a Bill of Costs within 14 calendar days of entry of judgment. (FRAP 39, Loc. R. 39(b)).

**PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC:** A petition for rehearing must be filed within 14 calendar days after entry of judgment, except that in civil cases in which the United States or its officer or agency is a party, the petition must be filed within 45 days after entry of judgment. A petition for rehearing en banc must be filed within the same time limits and in the same document as the petition for rehearing and must be clearly identified in the title. The only grounds for an extension of time to file a petition for rehearing are the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or an extraordinary circumstance wholly beyond the control of counsel or a party proceeding without counsel.

Each case number to which the petition applies must be listed on the petition and included in the docket entry to identify the cases to which the petition applies. A timely filed petition for rehearing or petition for rehearing en banc stays the mandate and tolls the running of time for filing a petition for writ of certiorari. In consolidated criminal appeals, the filing of a petition for rehearing does not stay the mandate as to co-defendants not joining in the petition for rehearing. In consolidated civil appeals arising from the same civil action, the court's mandate will issue at the same time in all appeals.

A petition for rehearing must contain an introduction stating that, in counsel's judgment, one or more of the following situations exist: (1) a material factual or legal matter was overlooked; (2) a change in the law occurred after submission of the case and was overlooked; (3) the opinion conflicts with a decision of the U.S. Supreme Court, this court, or another court of appeals, and the conflict was not addressed; or (4) the case involves one or more questions of exceptional importance. A petition for rehearing, with or without a petition for rehearing en banc, may not exceed 15 pages. Copies are not required unless requested by the court. (FRAP 35 & 40, Loc. R. 40(c)).

**MANDATE:** In original proceedings before this court, there is no mandate. Unless the court shortens or extends the time, in all other cases, the mandate issues 7 days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay issuance of the mandate. If the petition or motion is denied, the mandate will issue 7 days later. A motion to stay the mandate will ordinarily be denied, unless the motion presents a substantial question or otherwise sets forth good or probable cause for a stay. (FRAP 41, Loc. R. 41).

## U.S. COURT OF APPEAL FOR THE FOURTH CIRCUIT BILL OF COSTS FORM
(Civil Cases)

---

**Directions:** Under FRAP 39(a), the costs of appeal in a civil action are generally taxed against appellant if a judgment is affirmed or the appeal is dismissed. Costs are generally taxed against appellee if a judgment is reversed. If a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed as the court orders. A party who wants costs taxed must, within 14 days after entry of judgment, file an itemized and verified bill of costs, as follows:

- Itemize any fee paid for docketing the appeal. The fee for docketing a case in the court of appeals is $500 (effective 12/1/2013). The $5 fee for filing a notice of appeal is recoverable as a cost in the district court.
- Itemize the costs (not to exceed $.15 per page) for copying the necessary number of formal briefs and appendices. The court requires the filing of one paper copy of formal briefs and appendices unless the case is scheduled for oral argument, in which event three additional copies must be filed. The court does not require the filing of paper copies of informal briefs.
- Cite the statutory authority for an award of costs if costs are sought for or against the United States. See 28 U.S.C. § 2412 (limiting costs to civil actions); 28 U.S.C. § 1915(f)(1) (prohibiting award of costs against the United States in cases proceeding without prepayment of fees).

Any objections to the bill of costs must be filed within 14 days of service of the bill of costs. Costs are paid directly to the prevailing party or counsel, not to the clerk's office.

---

Case Number & Caption: _____

Prevailing Party Requesting Taxation of Costs: _____

| Docketing Fee: | | | | Charge: _____ |
|---|---|---|---|---|
| Document: _____ | No. of Pages: ____ | No. of Copies: ____ | x$.15/page | Charge: _____ |
| Document: _____ | No. of Pages: ____ | No. of Copies: ____ | x$.15/page | Charge: _____ |
| Document: _____ | No. of Pages: ____ | No. of Copies: ____ | x$.15/page | Charge: _____ |
| TOTAL AMOUNT CLAIMED IN BILL OF COSTS | | | | |

1. If copying was done commercially, I have attached itemized bills. If copying was done in-house, I certify that my standard billing amount is not less than $.15 per copy or, if less, I have reduced the amount charged to the lesser rate.
2. If costs are sought for or against the United States, I further certify that 28 U.S.C. § 2412 permits an award of costs.
3. I declare under penalty of perjury that these costs are true and correct and were necessarily incurred in this action.

**Signature:** _____   **Date:** _____

### Certificate of Service

I certify that on this date I served this document as follows:

**Signature:** _____   **Date:** _____