Filed:  November 1, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 15-1604**
(1:13-cv-01352-JFM)

───────────

MAKIA SMITH,

               Plaintiff - Appellant,

       v.

BALTIMORE CITY POLICE DEPARTMENT; ANTHONY W. BATTS, in his
official capacity as Commissioner of the Baltimore City
Police Department;   OFFICER NATHAN CHURCH, in both his
official and individual capacity as an officer of the
Baltimore City Police Department; OFFICER KENNETH CAMPBELL,
in both his official and individual capacity as an officer
of the Baltimore City Police Department,

              Defendants - Appellees,

      and

OFFICER WILLIAM PILKERTON, JR., in both his official and
individual capacity as an officer of the Baltimore City
Police Department; OFFICER NATHAN ULMER, in both his
official and individual capacity as an officer of the
Baltimore City Police Department,

              Defendants.

───────────

O R D E R

───────────

The Court amends its opinion filed October 27, 2016,
as follows:

On pages 3, 4 and 5 -- the references to "Hartford"
Road are corrected to read "Harford" Road.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1604**

---

MAKIA SMITH,

Plaintiff - Appellant,

v.

BALTIMORE CITY POLICE DEPARTMENT; ANTHONY W. BATTS, in his official capacity as Commissioner of the Baltimore City Police Department; OFFICER NATHAN CHURCH, in both his official and individual capacity as an officer of the Baltimore City Police Department; OFFICER KENNETH CAMPBELL, in both his official and individual capacity as an officer of the Baltimore City Police Department,

Defendants - Appellees,

and

OFFICER WILLIAM PILKERTON, JR., in both his official and individual capacity as an officer of the Baltimore City Police Department; OFFICER NATHAN ULMER, in both his official and individual capacity as an officer of the Baltimore City Police Department,

Defendants.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore.    J. Frederick Motz, Senior District Judge.    (1:13-cv-01352-JFM)

---

Argued: September 20, 2016          Decided: October 27, 2016

Amended: November 1, 2016

---

Before KEENAN, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Keenan and Judge Floyd joined.

**ARGUED:** Lawrence S. Greenberg, GREENBERG LAW OFFICE, Baltimore, Maryland, for Appellant. Suzanne Sangree, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:** Zebulan P. Snyder, GREENBERG LAW OFFICE, Baltimore, Maryland, for Appellant. George Nilson, City Solicitor of Baltimore City, William R. Phelan, Chief Solicitor, Glenn Marrow, Chief of Police Legal Affairs Division, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

THACKER, Circuit Judge:

Makia Smith ("Smith" or "Appellant") sued the Baltimore City Police Department ("BCPD") and several individual officers pursuant to 42 U.S.C. § 1983 and Maryland law. Smith claimed two officers battered and unlawfully arrested her after they saw her filming them as they arrested a juvenile. At trial, the district court allowed defense counsel to elicit testimony that Smith had been arrested three times before. The jury ultimately returned a verdict in favor of the two officers on all counts.

We fail to see how Smith's prior arrests were relevant to her claim for damages, which was the sole reason the district court admitted them, and any probative value of those arrests was far outweighed by prejudice to Smith. The admission of such evidence was prohibited by Federal Rule of Evidence 404(b) and was not harmless. Therefore, we reverse and remand for a new trial.

I.

A.

Officer Nathan Church of the BCPD testified to the following facts at the trial. On Friday, March 8, 2012, just as high school students were being released from school, Officer Church received a call for back-up to the 2800 block of Harford Road in Baltimore. He arrived to find several juveniles running

3

through the streets and another officer, Talmadge Jackson, attempting to arrest one of them. When Officer Church arrived, the juvenile was giving Officer Jackson a struggle. Officer Church and several other officers formed a "half-horseshoe" barrier between the public and Officer Jackson to "keep other juveniles from getting close to [Officer Jackson]." S.J.A. 7.[1]

Meanwhile, Officer Church heard tires screeching and turned to see multiple vehicles stopped on Harford Road. He testified that traffic was stopped and/or moving extremely slowly, and Smith's car was "blocking all the traffic behind her." S.J.A. 10-11. Smith was standing outside of her car with her phone up as if videotaping. Officer Church, over 50 feet away from Smith, yelled, "Ma'am, pull your car to the side or keep on going." Id. at 11. Smith replied, "I'm not going to let you hurt that young boy. I ain't moving -- I ain't moving [shit]." Id.

Officer Church "quickstep[ped]" toward Appellant and again told her to move, and she responded, "I'm not moving [shit]. [Fuck] y'all." S.J.A. 13-14. Officer Church moved closer, told her this was a traffic stop, and asked for her license. Smith "ran back into her car" and sat with her back

---

[1] Citations to the "S.J.A." refer to the Supplemental Joint Appendix filed by the parties in this appeal.

4

toward the passenger door, which Officer Church described as "not normal[]" and indicative of someone "trying to flee from the scene." Id. at 17-19. At that point, Officer Church reached in the car and was trying to grab for her keys, but Appellant began "kicking [him], throwing fists at [him], [and] scratching [him]." Id. at 19. At one point he was "being hit with a[n] [unidentified] hard object." Id. He placed his right arm on the vehicle and reached in the car with his left arm, "just trying to grab her and pull her out of the car." Id. She was "flailing" and Office Church was "keeping [his] face . . . out of harm's way." Id. at 22. Officer Church succeeded in pulling Smith out of the car, but he did not know what he grabbed onto, whether it was her hair or something else. He handcuffed her and began to effect an arrest. Pictures of Officer Church with visible red marks and scratch marks on his arm and neck were admitted into evidence.

Smith's version of the facts is quite different. According to her, while she was driving with her two-year-old daughter on Harford Road, she saw Officer Jackson arresting the juvenile and became concerned when she saw the officer's "knee pressed against his temple." J.A. 94.[2] She got out of her

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

5

vehicle, took the keys out, and pulled her cell phone up as if videoing what the officers were doing. Officer Church yelled, "What are you doing?" and Smith replied, "I'm just trying to make sure that you guys are not hurting that little boy and trying to make sure that he's okay." Id. at 97.

At that point, Officer Church "started coming towards the vehicle . . . [l]ike The Incredible Hulk, like Manny Pacquiao . . . in an aggressive . . . manner," and once he got closer to the vehicle, he started running. J.A. 97. Smith tried to get back in the car, but at that point, she could not have driven anywhere because traffic was still stopped. Officer Church came over to the car, "snatched the phone out of [her] hand and he kicked it and he stomped it." Id. at 99. He then said, "You want to film things, B[itch], film this. I should knock your teeth out." Id. Smith had one foot in the car and tried to get her other foot in the car when Officer Church "took both of his hands and dragged [her] out of the car" by her hair. Id. She did not punch, scratch, or kick Officer Church before he grabbed her hair because "that kind of thinking gets you killed," although she admitted to "flailing" to try and get Officer Church off of her. Id. at 101-02. Then she felt three or four other people join in but could not really see them. She felt someone hit her in the back of the head and then she "just blacked out." Id. at 102. The next thing she remembered is

6

being slammed onto the car and then seeing her daughter crying. Another officer, Officer Campbell, pulled her left arm back and all the way up and said, "Did you have enough yet? Do you want me to break it?" Id. at 103.

As they began to arrest her, Smith asked Officer Church if she could call her mother to come get her baby. Officer Church taunted, "No. Child Protective Services will be here to get your daughter." J.A. 105. Smith asked a bystander if she could come get her daughter out of the car, and the bystander did so. The officers put Smith in the patrol car, and she began yelling out her mother's phone number; another officer finally gave the bystander her mother's phone number.

Smith was taken away in the transport vehicle to a central booking station. Because she was complaining of head and neck pain, she was taken to a nearby hospital before booking. She was eventually charged with second-degree assault of Officer Church, resisting or interfering with arrest, failing to display a license on demand, willfully disobeying a lawful order of the police, and causing a vehicle to obstruct a free vehicle passage of a roadway. On January 3, 2013, after nearly a year of pre-trial release obligations, the charges against Smith were dropped via a nolle prosequi disposition.

7

B.

On May 8, 2013, Smith filed the instant action in the District of Maryland against the BCPD; Anthony Batts, Commissioner of the BCPD; Office Church; Officer Campbell; and two other officers at the scene, William Pilkerton and Nathan Ulmer (collectively, "Appellees"). The operative complaint, amended on October 9, 2014, alleged 13 counts: excessive force, deprivation of property without due process, and violations of the First and Fourth Amendments under 42 U.S.C. § 1983; violation of attendant rights under the state constitution; Monell[3] claims against the city; and state law claims of conversion, battery, false arrest, false imprisonment, and intentional infliction of emotional distress. Smith claimed a minimum of $1.5 million in damages for, inter alia, "emotional trauma, humiliation, distress, bodily injury and damage to personal property." J.A. 37-38.

The original district court judge to whom the case was assigned granted summary judgment to Officers Pilkerton and Ulmer on some of the counts and determined the case should be tried in two phases. First the jury would consider claims against Officers Church and Campbell, and then, the Monell claims against the city would proceed in a second phase if the

---

[3] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

8

jury determined any constitutional harm had occurred. As a result, at the trial underlying this appeal, only five claims proceeded against Officer Church -- the First Amendment, Fourth Amendment, excessive force, battery, and false arrest claims -- and two claims against Officer Campbell -- the excessive force and battery claims.

Notably, on March 9, 2015, Smith filed a motion in limine to exclude "all evidence or discussion of [Appellant's] prior arrests." J.A. 81. Smith had been arrested three times: for second degree assault in 2005, fleeing and eluding in 2006, and second degree assault in 2010.[4] No convictions followed any of Smith's prior arrests. The district court granted the motion on March 11, explaining, "There shall be no reference [at trial] to [Appellant]'s prior arrests." Id. at 86. On March 26, the case was reassigned to a new district court judge and proceeded to trial.

During the three-day trial in March 2015, the following relevant exchanges occurred. First, at a bench conference on March 25, directly before Smith's mother testified on her behalf, Appellees' counsel said, "I expect plaintiff's counsel to elicit [testimony from Smith's mother of] pain and

---

[4] The motion also mentioned a fourth arrest, which was not presented to the jury.

9

suffering after the event, [but] one of the Motions in Limine is
that we are not allowed to go into prior arrests.   . . . [I]f
[plaintiff's counsel] go[es] into it, I believe they opened the
door."   S.J.A. 79.   The court explained to Smith's counsel, "I
haven't heard the testimony yet.   But be forewarned.   It makes
sense to me."   Id. at 80.

> Smith's mother then testified as follows:
>
> Following the incident, . . . Makia cried
> every day.   She held onto [her daughter] and
> continued to apologize to her for what had
> happened.   You know, she was, "I'm sorry.   I
> didn't know that was going to happen.   I'm
> sorry."
>
> . . . .
>
> She didn't eat, and at night she would just
> be up crying . . . in her room crying.
>
> . . . .
>
> Her eyes would practically close where she
> just continued to cry and be depressed and
> sad.

Id. at 83-84.   Later that day, just before Smith testified,
Smith's counsel reiterated at a bench conference that the prior
arrests should not come in.   The district court explained,

> I have tremendous respect for [the judge who
> originally ruled on the motion in limine].
> He has not heard the evidence.   He didn't
> hear the mother give overemotional testimony
> which     was     shaded     with     hearsay
> . . . .
>
> I am letting it in.   I think it goes to
> whether or not she really suffered pain and

10

> suffering from this incident. So I'm
> letting it in for that reason.

Id. at 87. The court added, "I think [the original judge] is

right, you don't attack somebody's credibility by an arrest and

not a conviction, but I'm letting it in." Id.

During Appellant's testimony that same day, the

following exchange took place:

> **[SMITH]:** Every time I see a officer now, I
> immediately tense up. I remember once my
> taillight was out and I got pulled over, I
> was like extremely scared. Every time I see
> anything that goes on on TV, I kind of get
> upset because I really trusted in the
> officers. I was raised to respect officers
> and that they were people that should be
> respected, and I kind of was let down.
>
> **BY [Smith's counsel]:**
>
> **Q.** Had you ever had an interaction <u>like this</u>
> with an officer before?
>
> **A.** No.
>
> **Q.** Not just the Baltimore City Police
> Department, but anywhere?
>
> **A.** No.
>
> **Q.** What you just described, the problems you
> had, do you still have those problems?
>
> **A.** Most definitely.

J.A. 118 (emphasis supplied).

\*          \*          \*          \*

Then, during cross-examination, the following

testimony occurred:

11

**BY [BCPD's counsel]:**

**Q.** Ma'am, you said you were traumatized by this event; is that correct?

**A.** I think anybody would be.

**Q.** Okay. And you also testified that you were brought up to have respect for police and now you feel a little different; is that correct?

**A.** I don't feel that they shouldn't be respected. I feel like I was let down by them.

**Q.** You also remember when I had an opportunity to speak to you in my office, I asked you, I said this wasn't your first rodeo, was it?

**[Smith's counsel]:** Objection.

**THE COURT:** Let me tell you, it's important -- I think I know where [BCPD's counsel] is going, and I'm overruling the objection, which is understandable.

If the plaintiff -- am I right, the rodeo means arrest?

**[BCPD's counsel]:** That's correct, Your Honor.

**THE COURT:** If the plaintiff was arrested and the charges were dismissed, which is, I think, what happened, you can't use an arrest, and it's essential that you understand that. You cannot use the mere fact of an arrest to judge the plaintiff's credibility. That is absolutely essential.

Rightly or wrongly, having heard the testimony, I think that since the plaintiff says this has had such an effect on her that the fact of the arrest may be relevant to the amount of damages, if any, that she suffered. So that I'm letting it in.

12

> But please understand that you cannot
> consider an arrest to judge the plaintiff's
> credibility. That's absolutely against the
> rules, and it's a good rule, because they
> haven't -- you know, there hasn't been a
> trial. And there's an objection to this,
> and that's understandable.
>
> . . . .
>
> **[Smith's counsel]:** And in addition to the
> prior ruling from [the original judge] that
> you --
>
> **THE COURT:** [He] made his ruling, but [he]
> hadn't heard the testimony.
>
> **[Smith's counsel]:** Okay.
>
> . . . .
>
> **BY [BCPD's counsel]:**
>
> **Q.** When you were in my office, I asked you,
> I said this wasn't your first rodeo, was it?
>
> . . . .
>
> **[SMITH]:** Yes, I have been arrested before.
>
> **Q.** Right. And, matter of fact, when I asked
> you how many times, you said, "Two. No, I
> think three"; correct?
>
> **A.** I think so.

J.A. 133-35.

*       *       *       *

Appellees did not ask any further questions about the
prior arrests. But on redirect examination, Smith's counsel
asked about the nature of the prior arrests. As to the first
(second degree assault), Smith explained the father of her child
sent his girlfriend "to beat [her] up," and she merely defended

13

herself. J.A. 136. The second (fleeing and eluding) occurred when an officer tried to her pull her over, and she kept driving to pull into a lit area, rather than a dark area. The officer arrested her, but when she explained herself, he apologized. Finally, as to the third arrest (second degree assault), the father of her child showed up in the middle of the night and dragged her baby out of the house in her car seat, threw her out into the grass, and "tousl[ed]" Appellant around, and again, Appellant defended herself. Id.

The jury returned a verdict in favor of Officers Church and Campbell on all counts on March 30, 2015.[5] Appellant moved for a new trial, raising an unrelated issue, but her request was denied. She then filed this appeal, raising only one issue: whether the district court committed reversible error in admitting evidence of Appellant's prior arrests.

## II.

We review the district court's evidentiary decisions for abuse of discretion. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010). An abuse of discretion occurs only

---

[5] The district court later entered judgment in favor of BCPD and Batts pursuant to City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that where no underlying constitutional violation occurred, the city cannot be liable under Monell). See Order, Smith v. Baltimore City Police Dep't, No. 1:13-cv-1352 (D. Md. June 17, 2015), ECF No. 165.

14

when the district court acts "arbitrarily or irrationally" in
admitting evidence.  United States v. Benkahla, 530 F.3d 300,
309 (4th Cir. 2008) (internal quotation marks omitted). · Such
evidentiary rulings are, however, "subject . . . to harmless
error review." United States v. Johnson, 587 F.3d 625, 637 (4th
Cir. 2009).  "Where error is founded on a violation of Rule
404(b), the test for harmlessness is whether we can say with
fair assurance, after pondering all that happened without
stripping the erroneous action from the whole, that the judgment
was not substantially swayed by the error." United States v.
Madden, 38 F.3d 747, 753 (4th Cir. 1994) (internal quotation
marks omitted).

## III.

This appeal turns on whether the fact that Smith was
arrested three times before -- with no evidence that her prior·
arrests involved a struggle of any kind with police and with no
convictions stemming from the arrests -- makes it more or less
probable that she suffered emotional damages in the case at
hand, where the police allegedly cursed at her, beat her, and
threatened to turn her child over to Child Protective Services.
We think not, and indeed, the admission of that fact could
easily have tipped the scales in what the district court itself
called "a tough case" that boiled down to a classic he-said,
she-said dispute.  J.A. 158.

15

A.

Federal Rule of Evidence 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Prior act evidence is admissible, however, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

We utilize a four-part test to assess admissibility of prior-act evidence: "(1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the [claim]; (3) it must be reliable; and (4) its probative value must not be substantially outweighed by its prejudicial nature." United States v. Garcia-Lagunas, --- F.3d ---, 2016 WL 4547206, at *9 (4th Cir. Sept. 1, 2016) (alteration and internal quotation marks omitted). In her opening brief, Smith only questions the relevance and prejudicial nature of the prior arrests, so we limit our discussion to those two issues.

1.

## Relevance

It is well established that "a witness, whether a party or not, may not be asked questions as to irrelevant

16

matters on cross-examination for the purpose of . . .
discrediting [her]." United States v. Chase, 372 F.2d 453, 463
(4th Cir. 1967). Generally, "[r]elevant evidence is admissible"
unless otherwise prohibited by the Constitution, the Rules of
Evidence, statutes, or other rules prescribed by the Supreme
Court. Fed. R. Evid. 402. Evidence is relevant if "it has any
tendency to make a fact more or less probable than it would be
without the evidence," and "the fact is of consequence in
determining the action." Fed. R. Evid. 401(a), (b).

   Under Rule 404(b), "admission of evidence of other bad
acts to assist the jury in measuring the extent of damages is a
legitimate, non-character-based use of such evidence." Udemba
v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001) (citing Lewis v. Dist.
of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986)) (emphasis
supplied). But that evidence still must have "probative value
on the question of . . . damages" in the case at hand. Nelson
v. City of Chicago, 810 F.3d 1061, 1069 (7th Cir. 2016)
(internal quotation marks omitted).

   In Nelson, the plaintiff, Larry Nelson, sued officers
and the City of Chicago pursuant to § 1983 when Chicago police
officers pulled him over, pointed a gun at him, threatened to
kill him, and searched his car for no apparent reason. See
Nelson, 810 F.3d at 1064. At trial, the district court allowed
defense counsel to introduce Nelson's arrest record, which

17

included nine arrests between 1983 and 1999 and one in 2005.
See id. at 1066.

Nelson moved in limine to exclude the evidence of
prior arrests, but then he testified about his emotional
distress during the traffic stop, explaining, "I was terrified,
humiliated . . . I feared for my life." Nelson, 810 F.3d at
1067. The court then granted defense counsel's request to
introduce the prior arrest evidence, but explained it could only
come in for impeachment purposes and "on the theory that some of
[Nelson's] fear of the police may have been attributable to his
earlier arrests." Id. at 1067-68. The district court gave no
limiting instruction, although it prohibited mention of the
evidence in closing argument. The jury returned a verdict in
favor of the police. See id. at 1065-66.

The Seventh Circuit found reversible error. First, it
concluded the evidence was not relevant. The theories that his
arrest history "mitigated his fear during the traffic stop" or
"augmented it," were "tenuous at best," and the arrest history
had "miniscule probative value on the question of his damages."
Nelson, 810 F.3d at 1068-69 (emphases in original) (internal
quotation marks omitted). Indeed, "the arrests were distant in
time," and "Nelson carefully limited his claimed emotional
injury to the fear he felt during the 30 minutes of the traffic
stop itself." Id. at 1069; see also id. ("Although [Nelson]

18

said he remained angry about the incident despite the passage of time, he never claimed that the experience left him fearful of the police more generally."). The court also warned that allowing such evidence in § 1983 cases "would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case." Id. (quoting Barber v. City of Chicago, 725 F.3d 702, 715 (7th Cir. 2013)).

The court then decided the error was not harmless: "The jury heard that Nelson had been arrested numerous times, making him appear particularly unsympathetic. The trial turned entirely on his credibility, so the harm caused by improperly admitting this damaging evidence would naturally be substantial." Nelson, 810 F.3d at 1070. And even though defense counsel only asked one question and elicited only the fact of the prior arrests, the court explained, "[T]hat single question was especially damning, referring to 'numerous' prior arrests." Id.

Some decisions involving prior arrests allegedly bearing on damages, however, have gone the other way. See, e.g., Udemba, 237 F.3d at 15 (in § 1983 appeal, affirming district court's finding that evidence of subsequent arrest was

19

relevant to a contested issue in the case -- the extent of
damages attributable to emotional distress); <u>Karnes v. Skrutski</u>,
62 F.3d 485, 500 (3d Cir. 1995) (finding no abuse of discretion
in admitting evidence of prior arrest in § 1983 action where
plaintiff contended that the underlying incident diminished his
respect for police and, thus, caused him damage), <u>abrogated on
other grounds as recognized in</u> <u>Curley v. Klem</u>, 499 F.3d 199 (3d
Cir. 2007); <u>Montoya v. Sheldon</u>, 898 F. Supp. 2d 1259, 1273
(D.N.M. 2012) (allowing evidence of prior arrests in § 1983
action, explaining they "are relevant to the issue of
[plaintiff's] emotional distress damages, because the amount of
times and the manner in which [plaintiff] had been arrested
. . . makes more or less probable the Defendants' arrest
emotionally distressed him").

 Considering Smith's argument "with meticulous regard
to the facts of [her] case," <u>United States v. Hernandez</u>, 975
F.2d 1035, 1040 (4th Cir. 1992) (internal quotation marks
omitted), we find this case on par with <u>Nelson</u>, and we find the
reasoning of <u>Nelson</u> to be sound. Like Nelson, Smith did not
claim damages because she is now more fearful of police
generally; in fact, her testimony at trial was that she felt
"let down by them" but still thought they deserved respect.
J.A. 133. Rather, in her Amended Complaint she claims damages
for the allegedly unlawful arrest and use of excessive force

that occurred on March 8, 2012, and emotional damages stemming
from that encounter.     See id. at 37 (claiming damages for
"emotional trauma, humiliation, distress . . . suffered from the
acts of the Defendants" (emphasis supplied)).

         Appellees' relevance argument also falls apart given
the backdrop of Smith's testimony.    First of all, on direct
examination, Smith clearly testified she had "[n]ever had an
interaction like this with an officer before."    J.A. 118
(emphasis supplied).    Rather than try and disprove this
testimony, defense counsel pointedly asked Smith if this was her
"first rodeo," J.A. 133, a question that Baltimore City Law
Department's own appellate counsel admitted was "a very poor way
of asking her whether she had been arrested before," Oral
Argument at 19:01, Smith v. Baltimore City Police Dep't, No. 15-
1604 (4th Cir. Sept. 20, 2016), http://www.ca4.uscourts.gov/
oral-argument/listen-to-oral-arguments.      This  is  a  clear
indication that the evidence was being used to show character
and propensity, rather than to demonstrate the extent of her
damages.

         Perhaps most damning to Appellees' position, however,
is not what defense counsel said, but what he failed to say.
Appellees made no record of -- and the district court did not
inquire -- whether these prior arrests were of a similar nature
to the case at hand.     "There is, after all, a material

21

difference between being arrested and being subjected to excessive force in the course of that arrest." Sanchez v. City of Chicago, 700 F.3d 919, 931 (7th Cir. 2012). And by eliciting the mere fact of Smith's three prior arrests with no further details, the jurors were permitted to fill in the gaps themselves and let their imaginations run wild.

In sum, the district court did not determine whether the three prior arrests involved conduct remotely similar to the arrest in this case; Smith is claiming damages specifically for the alleged conduct of the March 8, 2012 arrest; and defense counsel's questioning reveals the evidence was admitted for purposes of credibility, propensity, and character of Smith. Therefore, based on this record, the evidence was irrelevant to damages, and the district court abused its discretion in admitting it.

2.

Prejudice

Even if the prior arrests possessed a trace of probative value, we find the risk of prejudice from the mention of the prior arrests to be "enormous." Nelson, 810 F.3d at 1069. For one thing, it is common sense that "evidence of prior arrests . . . generally impugns character." Id. And "[i]t's doubtful that the jury drew the distinction between an arrest and a legal finding of wrongdoing[.]" Id.

22

Of course, prejudice may be mitigated by "carefully framed" limiting instructions regarding "proper consideration of [the] evidence." United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013); see also Sanchez, 700 F.3d at 932 (assuming error occurred with admission of statement that § 1983 plaintiff had been arrested "several" times in the past, finding no harm where court "gave a limiting instruction admonishing the jury that it was to consider this evidence only insofar as it shed light on the extent of any emotional harm he experienced"). But assuming limiting instructions in this type of case are even effective,[6] here, we cannot say the instructions were carefully framed or sufficiently explained how the jury should have properly considered the evidence. Rather, they afforded "meager protection" at best. United States v. Johnson, 617 F.3d 286, 297 (4th Cir. 2010).

The court gave the following instructions to the jury during Smith's testimony:

> If the plaintiff was arrested and the charges were dismissed, which is, I think, what happened, you can't use an arrest, and it's essential that you understand that.

---

[6] Cf. United States v. Jones, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring) ("Telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom.").

> You cannot use the mere fact of an arrest to judge the plaintiff's credibility. That is absolutely essential.
>
> Rightly or wrongly, having heard the testimony, I think that since the plaintiff says this has had such an effect on her that the fact of the arrest may be relevant to the amount of damages, if any, that she suffered. So that I'm letting it in.
>
> But please understand that you cannot consider an arrest to judge the plaintiff's credibility. That's absolutely against the rules, and it's a good rule, because they haven't -- you know, there hasn't been a trial.

J.A. 134-35.[7] This was the universe of the instruction, since the district court did not give a limiting instruction in the jury charge before deliberations. The court mentioned only credibility and nothing about "character," which is also forbidden use of the evidence and is listed in the text of Rule 404(b) itself, or "propensity to break the law," which is prohibited under our case law, and which became a central issue in this trial. United States v. Young, 248 F.3d 260, 271 (4th Cir. 2001). And while the court instructed the jury to consider the testimony on the issue of damages, it did not confine the

---

[7] Appellees claim Smith did not properly object to the limiting instruction. However, directly after the district court gave the instructions above, Smith's counsel noted his "continuing objection," to which the district court responded, "Oh, you have an absolutely continuing objection." J.A. 134. We find this sufficient to preserve the argument for our review.

24

jury's consideration to that issue.    Thus, prejudice in this
case far outweighed any perceived probative value of the three
arrests.

B.

Having found error, we must now consider whether it is
harmless, i.e., "whether we can say with fair assurance, after
pondering all that happened without stripping the erroneous
action from the whole, that the judgment was not substantially
swayed by the error."    United States v. Madden, 38 F.3d 747, 753
(4th Cir. 1994) (internal quotation marks omitted).

We cannot say with fair assurance the judgment was not
substantially swayed by the admission of Smith's prior arrests.
Smith's and Officer Church's accounts of their interaction were
extremely    different.    The    main    issues    in    the    case
-- who assaulted whom, whether probable cause to arrest existed,
whether the force used by Officer Church was justified -- hinged
on which witness the jury believed, making the trial a classic
he-said, she-said dispute.    The district court itself admitted
this was a "tough case."    J.A. 158.    Thus, the jury's view of
Smith's credibility and character was necessarily central to its
verdict.

Once the jury heard the evidence, it is reasonable
that they assumed "where there's smoke, there's fire."    Nelson,
810 F.3d at 1069.    And again, the limiting instructions in this

25

case failed to mitigate the prejudice naturally flowing from this questioning. Cf. Barber, 725 F.3d at 717 ("At some point judicial presumptions must give way to commonsense, and the formulaic recitation of a pro forma limiting instruction may not suffice to cure an error as it may fail to instruct the jury meaningfully as to what it legitimately may do with the evidence."). Therefore, the error in this case was not harmless and requires reversal.

IV.

For the foregoing reasons, we reverse the judgment below and remand for a new trial.

REVERSED AND REMANDED